UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PUBLIC INTEREST LEGAL FOUNDATION,

     Plaintiff,

v

JOCELYN BENSON, in her official capacity as
Michigan Secretary of State,

     Defendant.

No. 1:21-cv-00929

HON. ROBERT J. JONKER

| | |
|---|---|
| Kaylan Phillips<br>Noel Johnson<br>Charlotte M. Davis<br>Public Interest Legal Foundation<br>32 East Washington Street, Suite 1675<br>Indianapolis, Indiana 46204<br>317.203.5599<br>kphillips@publicinterestlegal.org<br>njohnson@publicinterestlegal.org<br>cdavis@publicinterestlegal.org | Heather S. Meingast (P55439)<br>Erik A. Grill (P64713)<br>Assistant Attorneys General<br>PO Box 30736<br>Lansing, Michigan 48909<br>517.335.7659<br>meingasth@michigan.gov<br>grille@michigan.gov |

/

**DEFENDANT SECRETARY OF STATE JOCELYN BENSON'S BRIEF IN SUPPORT
OF HER PARTIAL MOTION TO DISMISS**

DANA NESSEL
Attorney General

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
(P55439)

Dated:  December 13, 2021

**TABLE OF CONTENTS**

Page

Table of Contents ............................................................................................................. i

Index of Authorities ......................................................................................................... ii

Concise Statement of Issues Presented ........................................................................... iv

Introduction ...................................................................................................................... 1

Statement of Facts ............................................................................................................ 2

    A.    Overview of NVRA's list maintenance requirements. ......................................... 2

    B.    Michigan's list maintenance practices with respect to deceased voters. ............... 5

    C.    The NVRA's public disclosure requirement. ......................................................... 7

    D.    PILF's notices of violation and request for inspection. ......................................... 8

Standard of Review .......................................................................................................... 12

Argument ......................................................................................................................... 13

I.    PILF has failed to state a claim against the Secretary of State for a violation of the National Voter Registration Act's list maintenance requirements. ................................. 13

    A.    This Court lacks jurisdiction over claims brought by a plaintiff who lacks standing. ................................................................................................................ 13

        1.    PILF's letters did not satisfy the necessary pre-requisite for asserting a private cause of action under the NVRA. ............................... 15

        2.    PILF's allegations fail to sufficiently allege Article III standing. ............ 17

    B.    PILF's complaint fails to state a claim for a violation of NVRA's list maintenance requirements. ................................................................................... 20

Conclusion and Relief Requested ................................................................................... 24

# INDEX OF AUTHORITIES

Page

**Cases**

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) ................. 13, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 13, 20

*Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997) .......................... 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 12, 20

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ..................................................................... 1, 23

*Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912 (6th Cir. 2002) ................................. 13

*Coyne v. Amer. Tobacco Co.*, 183 F.3d 488 (6th Cir. 1999) ......................................................... 13

*Doe v. Dewine,* 910 F.3d 842 (6th Cir. 2018) ............................................................................... 19

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) ...................................................... 19

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167 (2000) ........................... 19

*Ga. State Conference of the NAACP v. Kemp*, 841 F. Supp. 2d 1320 (N.D. Ga. 2012) .............. 15

*Grendell v. Ohio Supreme Court*, 252 F.3d 828 (6th Cir. 2001) .................................................. 17

*Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) ........................................................... 17, 18

*Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833 (2018) ..................................................... 1, 16

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................................... 14

*Lyshe v. Levy*, 854 F.3d 855 (6th Cir. 2017) ................................................................................ 12

*New England Health Care Employee Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495 (6th Cir. 2003) ...................................................................................................................................... 22

*Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) ................. 19

*Public Interest Legal Foundation (PILF) v. Boockvar*, 495 F. Supp.3d 354 (M.D. Pa, 2020) ... 16, 22

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125 (6th Cir. 1996) ........................... 12

*Rogers v. Stratton Indus.*, 798 F.2d 913 (6th Cir. 1986) .............................................................. 12

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) ...................................... 18

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014) ........................................................................... 15

*Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977 (6th Cir. 2020) ......................... 18

*Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540 (2016) ............................................... 17, 18

*Taylor v. KeyCorp.*, 680 F.3d 609 (6th Cir. 2012) ....................................................................... 13

*Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008) ........................................................................................................................................... 12

*Weiner v. Klais & Co*, 108 F.3d 86 (6th Cir. 1997) ....................................................................... 9

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) ........................................................................... 13, 14

**Statutes**

Mich. Comp. Laws § 168.1 ............................................................................................................. 5

Mich. Comp. Laws § 168.509dd(1) ................................................................................................ 7

Mich. Comp. Laws § 168.509dd(3) ................................................................................................ 7

Mich. Comp. Laws § 168.509m ...................................................................................................... 5

Mich. Comp. Laws § 168.509m(1)(a) ............................................................................................ 4

Mich. Comp. Laws § 168.509n ....................................................................................................... 5

Mich. Comp. Laws § 168.509o .................................................................................................... 4, 5

Mich. Comp. Laws § 168.509p ....................................................................................................... 4

Mich. Comp. Laws § 168.509q ....................................................................................................... 4

Mich. Comp. Laws § 168.509r ........................................................................................... 4
Mich. Comp. Laws § 168.509r(5)...................................................................................... 6
Mich. Comp. Laws § 168.509r(6)...................................................................................... 7
Mich. Comp. Laws § 168.509r(7)...................................................................................... 7
Mich. Comp. Laws § 168.509r(8)...................................................................................... 7
Mich. Comp. Laws § 168.509z(c) ..................................................................................... 5
Mich. Comp. Laws § 168.510............................................................................................ 6

**Rules**
Fed. R. Civ. P. 12(b)(1)................................................................................................... 13

**Constitutional Provisions**
52 U.S.C. § 20501(b) ................................................................................................... 1, 2
52 U.S.C. § 20507(a)(2).................................................................................................... 2
52 U.S.C. § 20507(a)(3)................................................................................................ 3, 19
52 U.S.C. § 20507(a)(4) ...................................................................................... 1, 3, 15, 21
52 U.S.C. § 20507(b)(1) ................................................................................................... 3
52 U.S.C. § 20507(d)(2) ................................................................................................... 8
52 U.S.C. § 20507(i)......................................................................................................... 8
52 U.S.C. § 20510(a) ...................................................................................................... 15
52 U.S.C. § 20510(b)(1) ................................................................................................. 14
52 U.S.C. § 21083(a)(1)(A) .............................................................................................. 4
52 U.S.C. § 21083(a)(2)(B)(ii) .......................................................................................... 4

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Whether Plaintiff lacks standing to bring this action under NVRA?

2.    Whether Plaintiff has failed to state a claim for a violation under the National Voter Registration Act?

iv

**INTRODUCTION**

The National Voter Registration Act of 1993 (NVRA) was enacted, in part, "to increase the number of eligible voters" and to enhance participation in the electoral process. 52 U.S.C. § 20501(b). These purposes are among equally laudable goals of protecting the integrity of the electoral process, and maintaining accurate and correct voter registration rolls, *id.*, but in enacting the law, Congress recognized first and foremost that the right to vote "is a fundamental right." 52 U.S.C. § 20501(a). The complaint fails to identify any action taken against Plaintiff Public Interest Legal Foundation (PILF), or any policy, procedure, or law at play in Michigan that counteracts the NVRA's goal of electoral integrity.

This is equally true with respect to section 8 of the NVRA, which is at issue here. This section requires only that a state conduct a general program, which is "uniform, non-discriminatory" and makes a "*reasonable* effort to remove the names of ineligible voters" from the official voter registration list by reason of the voter's request, notice of death, or change of residence after certain precautions are taken. 52 U.S.C. § 20507(a)(4), (b), (d), (e). [Emphasis added]. The NVRA does not require a state enact an exhaustive program to remove every voter who becomes ineligible (much less every voter whom a private party *claims* is ineligible), and actually prohibits the state from removing voters systematically within ninety (90) days before a federal election or immediately for reasons other than death or by request. *See Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833 (2018); *Bellitto v. Snipes*, 935 F.3d 1192, 1201, 1207 (11th Cir. 2019). As explained below, Michigan's election law provides such a program—and there is no allegation of action taken against PILF or by Defendant Secretary of State Jocelyn Benson to contradict this.

1

Nor are there sufficient allegations to demonstrate PILF's standing to bring these claims. The NVRA's private right of action comes in the context of, and not as an alternative to, this Court's Article III jurisdictional boundaries. PILF has not alleged sufficient factual basis for standing to invoke this Court's jurisdiction.

Michigan values a robust democracy and takes seriously its list-maintenance responsibility. But PILF has not alleged a cognizable injury-in-fact, fairly traceable to Defendant's conduct or redressable by a favorable judicial decision to authorize this Court's jurisdiction over any claim to the contrary. This Court should grant Defendant's partial motion to dismiss as to Count I in this case.

## STATEMENT OF FACTS

### A.    Overview of NVRA's list maintenance requirements.

The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "to make it possible for Federal, State and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters for Federal office," "to protect the integrity of the electoral process," and "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). Section 8 of the NVRA, codified in 52 U.S.C. § 20507, provides several procedures or other requirements to be carried out by participating states with respect to the administration of voter registration. This includes efforts aimed at insuring "each eligible applicant" is registered to vote in an election and taking precautions against hasty removals of registrants from voter rolls.

Section 8 of the NVRA requires a state to notify voters of the disposition of an application for registration, 52 U.S.C. § 20507(a)(2), and prohibits the removal of a name of a

2

registrant except in narrow circumstances, i.e., at the registrant's request, "by reason of criminal conviction or mental incapacity," or through a "general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death or upon a change of address.  52 U.S.C. § 20507(a)(3), (4).

The NVRA does not require states to comply with any particular program or to immediately remove every voter who may have become ineligible.  Rather, a state must "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of: (A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) [of]"  52 U.S.C. § 20507(a)(4)(A)-(B) (emphasis added).

Subsection (b) requires that the program implemented to remove voters under subsection (a)(4) be a "nondiscriminatory" program, 52 U.S.C. § 20507(b)(1), and "shall not result in the removal of the name of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote" except where the state complies with certain requirements for removing voters under section 20507(b)(2).

With respect to any removal program, however, a state must generally complete any program to remove voters from official lists not later than 90 days before a primary or general election for Federal office:

> (2)(A) A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to *systematically remove* the names of ineligible voters from the official lists of eligible voters.

> (B) Subparagraph (A) shall not be construed to preclude--
> (i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a); . . . . [Emphasis added.]

Thus, a systematic removal program must be concluded 90 days before a Federal election, but this provision does not preclude removing particular voters who request to be removed or become ineligible based on a criminal conviction, *see* § 20507(a)(3)(A)-(B), or who have died, *see* § 20507(a)(4)(A).

In addition to NVRA, the federal Help America Vote Act (HAVA) of 2002 provides that "each State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, . . . computerized statewide voter registration list . . . that contains the name and registration information of every legally registered voter in the State. . . ." 52 U.S.C. § 21083(a)(1)(A).  Moreover, § 21083(a)(1)(A)(viii) states that "the computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State."  Michigan complied with these requirements long ago when it created the qualified voter file (QVF) as the State's computerized statewide voter registration list.  Mich. Comp. Laws §§ 168.509m(1)(a), 168.509o, 168.509p, 168.509q, 168.509r.  Michigan currently has over 8 million registered voters in the QVF.[1]  HAVA further requires that "the list maintenance performed . . . shall be conducted in a manner that ensures that . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list."  52 U.S.C. § 21083(a)(2)(B)(ii).  Additionally, § 21083(a)(4)(B) of HAVA provides that "the State election system shall include provisions to ensure that voter registration records are accurate and are updated regularly, including . . . safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters."  The HAVA provisions essentially parallel or incorporate NVRA.

---

[1] *See* Michigan Department of State, Bureau of Elections, Voter registration statistics, available at Voter registration statistics (state.mi.us).

**B.** **Michigan's list maintenance practices with respect to deceased voters.**

After NVRA was enacted, Michigan made a significant number of amendments to the Michigan Election Law, Mich. Comp. Laws § 168.1 *et seq*., to incorporate or come into compliance with its requirements. Most of these changes to the law originated in 1994 P.A. 441.[2] Section 509n makes the Secretary of State responsible for coordinating the requirements under NVRA. Mich. Comp. Laws § 168.509n.

With respect to the deaths of registered voters, section 509o requires the Secretary of State to "develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license . . . or an official state personal identification card . . . of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased." Mich. Comp. Laws § 168.509o(4). The Secretary must also "make the canceled voter registration information . . . available to the clerk of each city or township to assist with the clerk's obligations under section 510." (*Id.*) *See also* Mich. Comp. Laws § 168.509z(c) ("The secretary of state shall notify each clerk of the following information regarding residents or former residents of the clerk's city or township . . . death notices received by the secretary of state.") Based on these laws, "each week the Michigan Department of State uses information from the Social Security Death index [SSDI] to cancel the records of individuals in the [QVF] who have died."[3] However, "in some cases, this process may not identify an individual who has died, in which case that individual will stay on the voter

---

[2] *See generally*, Mich. Comp. Laws §§ 168.509m, 509n, 509o, 509p, 509q, 509r, 509t, 509u, 509v, 509w, 509x, 509z, 509aa, 509bb, 509cc, 509dd, 509ee, 509ff, and 509gg.
[3] *See* Michigan Department of State, Bureau of Elections, Fact Checks, Michigan's list of registered voters is maintained in accordance with federal law, available at SOS - Fact Checks (michigan.gov).

rolls until the local election clerk identifies the deceased individual's record and cancels it."[4]

This can happen when there is insufficient matching information for a voter between the SSDI and the record in the QVF.  A registration generally will only be automatically cancelled if the full name, full date of birth, and social security number match.

Under section 510, "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county. The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors."  Mich. Comp. Laws § 168.510.[5]  Local clerks are instructed that they are authorized to cancel a voter's registration if the "clerk receives or obtains information that the voter has died" through "QVF inbox notification," from the "county clerk," from "death notices published in [a] newspaper" or from "personal firsthand knowledge."[6]

Section 509r(5) further provides that the Secretary must create and maintain "an inactive voter file."  Mich. Comp. Laws § 168.509r(5).  Section 509r provides that voters who fail to vote for 6 years or confirm residency information must be placed in the inactive file:

> (6) If an elector is sent a notice under section 509aa to confirm the elector's residence information or if an elector does not vote for 6 consecutive years, the secretary of state shall place the registration record of that elector in the inactive voter file. The registration record of that elector must remain in the inactive voter file until 1 of the following occurs:
>
>   (a) The elector votes at an election.

---

[4] *See* Michigan Department of State, Bureau of Elections, Deceased voters' ballots are not counted, available at Deceased_Voters_Fact_Check_707424_7.pdf (michigan.gov).

[5] County clerks act as the local registrar for purposes of maintaining vital records and statistics, such as deaths.  Mich. Comp. Laws §§ 333.2804(4), 333.2815, 333.2833.

[6] *See* Michigan Department of State, Michigan Bureau of Elections, Election Officials' Manual, November 2019, Chapter 2, Voter Registration, p 21, available at II_Voter_Registration_265983_7.pdf (michigan.gov).

(b) The elector responds to a notice sent under section 509aa.

(c) Another voter registration transaction involving that elector occurs. [Mich. Comp. Laws § 168.509r(6).]

However, "[w]hile the registration record of an elector is in the inactive voter file, the elector remains eligible to vote and his or her name must appear on the precinct voter registration list." Mich. Comp. Laws § 168.509r(7).  If a voter on the inactive voter file "votes at an election by absent voter ballot, that absent voter ballot must be marked in the same manner as a challenged ballot . . . ." Mich. Comp. Laws § 168.509r(8).

Local clerks are authorized to conduct programs to remove names from the QVF. Section 509dd provides that a "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township." Mich. Comp. Laws § 168.509dd(1).  Such a program must be uniformly administered and comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals done at the request of the voter, upon the death of a voter, or upon notice that the voter has moved and registered in a different jurisdiction.  Mich. Comp. Laws § 168.509dd(1), (2)(a)-(c).  To conduct a removal program, a local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, or participate "in the national change of address program established by the postal service." Mich. Comp. Laws § 168.509dd(3).

**C.      The NVRA's public disclosure requirement.**

In addition to its list maintenance requirements, the NVRA also includes a public disclosure requirement.  Section 8 provides:

> (1) Each State shall maintain for at least 2 years and *shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible*

7

*voters,* except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2)[7] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i) (emphasis added).[8]

**D.       PILF's notices of violation and request for inspection.**

On September 18, 2020, about 6 weeks before the November 2020 presidential election, PILF wrote to Secretary Benson advising that it believed Michigan was violating NVRA's list maintenance requirements by failing to remove deceased voters from the rolls.  (ECF No.1-4, Ex 4, PageID.48.)  PILF asserted that it had compared a September 2019 version of the QVF against the U.S. Social Security Death Index (SSDI) and obituaries and other public notices and determined that there were "potentially more than 34,000 deceased individuals with an active registration" in the state.  (*Id*., PageID.49.)  More specifically, as explained in the complaint, PILF obtained a "data analytics expert" who "cross-referenced" registered voters in the QVF's active file "with commercial databases (e.g., credit reporting agencies and other licensed databases)" to obtain "full dates of birth" for the voters, and to check for commercial activity "to help limit the possibility of false positives."  (ECF No. 1, Compl., PageID.8, ¶ 30.)  The expert then sent the names, addresses, and dates of birth of the voters to a "federally licensed database vendor" that has access to the SSDI.  (*Id*., PageID.9, ¶ 31.)  After "matching Social Security Numbers" to voters in the expert's QVF sample, the list was examined against the SSDI "to

_____

[7] The reference to "notices" under 52 U.S.C. § 20507(d)(2) concern notices sent to voters before their names can be removed from the list of eligible voters.
[8] The disclosure requirement is the subject of Count II of PILF's complaint, which Defendant is not presently moving to dismiss.

identify the names of those registrants who are deceased," which "process identified 34,000 potentially deceased registrants on Michigan's voter rolls." (*Id.*)  PILF requested a meeting to discuss this issue and how to rectify it and gave notice of a possible statutory violation of the NVRA.  (*Id.*, ECF No. 1-4, Ex 4, PageID.50.)

On September 29, 2020, staff from the Secretary's Bureau of Elections (BOE) responded to PILF's September 18th letter, requesting that, "in order to determine how to best proceed," that PILF "provide a written description of the matching criteria used by [PILF] to substantiate" its claims "as well as electronic lists of voters PILF has identified as 'potentially deceased with an active registration[.]' " (Ex A, 9/30/20 BOE Email & Letter.)[9]  The letter noted that it was "essential that PILF share its data and matching criteria with BOE, particularly in view of your acknowledgement that BOE is best positioned to 'conclusively determine' whether these QVF records actually represent deceased individuals[.]" (*Id.*)

PILF responded to the BOE's letter on October 5, 2020, by providing a "spreadsheet [ ] identifying the voter ID numbers of the registrants [it] identified," and stating that it had compared registrants against the SSDI and matched full names, full dates of birth, SSNs, and credit address history information, which revealed "27,000 records of concern.  The remainder match other verifiable death record sources." (ECF No.1-6, Ex 6, PageID.52.)  PILF requested a response by October 8, 2020, of what action the Secretary planned to take based "on this credible information[.]" (*Id.*)

BOE staff subsequently reviewed PILF's October 5, 2020, letter and spreadsheet.  The spreadsheet, however, was not responsive to the BOE's September 30 letter because all that the

---

[9] On a motion to dismiss, this Court can consider documents referred to in the complaint and are central to the claims. *Weiner v. Klais & Co*, 108 F.3d 86, 89 (6th Cir. 1997).

sheets contained was a list of voter ID numbers without any corresponding matching criteria. (Ex B, Screenshot Deceased Voter spreadsheet.)  In other words, the spreadsheet did not identify or provide the specific criteria that was used to determine each particular voter was likely deceased.  (*Id.*)  PILF did not provide any basis upon which to believe that the names of individuals it found to be deceased represent the same actual people who were registered to vote. Therefore, even if BOE could verify that all the names provided belonged to registered voters in Michigan, BOE would have no basis for thinking any of them were deceased other than PILF's bare assertion – which it declined to provide evidence to support.  Notably, BOE did a sample review of several of the entries on the spreadsheet PILF provided, which revealed that the voters had, in fact, been cancelled as deceased.  Given the lack of specific, matching information provided by PILF and the fact that the November 3, 2020, general election was only a month away, BOE staff did not have sufficient information or the time to respond to PILF's letter.

On November 25, 2020, two days after Michigan had certified the results of the November 2020 general election and the day before the Thanksgiving Holiday, PILF sent a follow-up letter noting that it had not received a response to its October 5 letter and explaining that it had purchased another copy of the QVF in October and performed the same comparisons, which indicated that over 27,500 voters were on the QVF despite SSDI indications that they were deceased.  (ECF No. 1-8, Ex 8, PageID.61.)  But PILF did not provide a spreadsheet of voters identified as deceased from the October 2020 QVF comparison.  (*Id*.)  PILF again requested a meeting to discuss its findings.  (*Id*.)

On December 11, 2020, PILF sent a request for an inspection of records under NVRA. (ECF No. 1-9. Ex 9, PageID.63.)  PILF requested inspection of:

    1)   Data files [the Secretary's] office has received from the Social Security Administration listing deceased individuals.

2) Any records relating to the cancelation of deceased registrants from the [QVF], including but not limited to reports that have or can be generated from Michigan's QVF.

3) Any records relating to the investigation of potentially deceased registrants who are listed on the QVF, including but not limited to correspondence between your office and local election officials.

4) All records and correspondence regarding your use of the Electronic Registration Information Center to conduct voter roll list maintenance.

(*Id.*, PageID.64.)  Notably, the request did not include date parameters for the records sought. The letter noted that PILF planned to send a representative to the Secretary's offices on December 18, 2020—a mere 7 days after the request—unless copies of the records were provided.  (*Id.*)  On December 17, 2020, BOE staff advised PILF that it had not agreed to the inspection date and that the BOE's offices were closed to the public due to the pandemic and thus no inspection could take place on that particular date.  (ECF No. 1-10, Ex 10, PageID.65.) BOE staff further noted that they were "still awaiting [PILF's] matching criteria . . . so [the BOE] may properly analyze [PILF's] request and determine appropriate next steps."  (*Id.*)  A day later, on December 18, 2020, PILF sent a letter titled as a notice of violation of the NVRA with respect to its request for an inspection of records and requesting that the records be provided electronically.  (ECF No. 1-11, Ex 11, PageID.67-68.)

Finally, on January 13, 2021, PILF sent another letter to Secretary Benson reminding the Secretary of its earlier letters and request for inspection, and resending the deficient October 5, 2020, spreadsheets.  (ECF No. 1-13, PageID.72-73.)  The letter opined that Michigan was in violation of the NVRA in both respects.  (*Id.*)

According to the complaint, subsequent to that letter, PILF purchased the QVF on two more occasions and had its data analytics expert compare the October 5 list of deceased voters to the new QVF lists and found that "25,975, or 94 percent of the more than 27,500 potentially

deceased registrants previously identified out of the examined subset of Michigan's QVF remained on the rolls as of August 5, 2021." (ECF No. 1, Compl., PageID.14, ¶¶ 49-53.) PILF further states that its August 2021 analysis revealed 334 voter registrations where dates of death per the SSDI preceded dates of registration as shown in the official QVF extract. (*Id.*, PageID.15, ¶ 54.) PILF thereafter filed this lawsuit on November 3, 2021.

### STANDARD OF REVIEW

Whether a party has Article III standing is properly an issue of a court's subject matter jurisdiction under Rule 12(b)(1). *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). Unlike a motion to dismiss for failure to state a claim under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1)[,] ... the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986)) (emphasis omitted).

When considering a 12(b)(6) motion to dismiss for failure to state a claim, although the Court should presume that all well-pleaded material allegations of the complaint are true, *see Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations omitted). Moreover, the court need not accept as true legal conclusions or unwarranted factual inferences. *Total Benefits*, 552 F.3d at 434.

To survive dismissal, the plaintiff's claim must be plausible. *Bell Atl. Corp.,* 550 U.S. at 555. The inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, in evaluating the sufficiency of a plaintiff's pleadings, this Court may make reasonable inferences in the non-moving party's favor, "but [this Court is] not required to draw [P]laintiffs' inference." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005).

**ARGUMENT**

**I.      PILF has failed to state a claim against the Secretary of State for a violation of the National Voter Registration Act's list maintenance requirements.**

In Count I of the complaint, PILF argues that the Secretary has failed to make reasonable efforts to conduct voter list maintenance programs that ensure that deceased voters do not remain registered to vote, in violation of Section 8 of the NVRA. (ECF No. 1, PageID.17, ¶ 63.)

**A.      This Court lacks jurisdiction over claims brought by a plaintiff who lacks standing.**

When the plaintiff lacks standing to bring claims in federal court, this Court lacks jurisdiction and, accordingly, dismissal is warranted under Fed. R. Civ. P. 12(b)(1). *Taylor v. KeyCorp.*, 680 F.3d 609, 612-13 (6th Cir. 2012). "It is well established… that before a federal court can consider the merits of a legal claim, the person seeking to invoke [its] jurisdiction … must establish the requisite standing to sue." *Whitmore v. Arkansas,* 495 U.S. 149, 154-55 (1990) (internal quotations omitted.) And with good reason. "[T]he standing requirement limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into a 'vehicle for the vindication of the value interests of concerned bystanders.' " *Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Coyne v. Amer. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999) (internal citations and quotations omitted.)).

13

PILF, as an organization, can demonstrate standing in two ways: associational standing and organizational standing.  PILF does not appear to be a member organization, so presumably its claim for standing is based on the latter.  An organization can establish standing to sue on its own behalf by demonstrating three elements: (1) the organization suffered an injury in fact this is both "concrete and particularized, and actual or imminent, not conjectural or hypothetical;" (2) the injury is "fairly traceable to the challenged action of the defendant;" and (3) it is likely, "as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (footnote, citations, and internal quotation marks omitted); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79 (1982).  These elements are "not mere pleading requirements," but an "indispensable part of plaintiff's case[.]" *Lujan*, 504 U.S. at 561-62.  The NVRA also includes an additional requirement to invoke this Court's jurisdiction.  Specifically, Congress authorized a private cause of action only by a person "aggrieved by a violation of [the NVRA]" and who provides "written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1).  Where, as here, PILF's allegations fail to satisfy these elements, this Court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore,* 495 U.S. at 155-56.

PILF's allegations of standing are deficient.  As explained below, PILF's letters to the Secretary of State do not satisfy the notice requirement of the NVRA.  Moreover, the complaint lacks any allegation of an injury-in-fact particular to PILF, much less one "fairly traceable" to any conduct by Secretary Benson, or which is likely to be redressed by the relief requested from this Court.

14

1.      **PILF's letters did not satisfy the necessary pre-requisite for asserting a private cause of action under the NVRA.**

PILF's reliance on "statutory standing," based on its several letters to Defendant Benson misses the mark.  Certainly, the NVRA authorizes a private right of action—but only by the Attorney General or a "person aggrieved by a violation" of the NVRA.  52 U.S.C. § 20510(a), (b).  Absent an executive declaration from the state of its intent not to comply with NVRA federal courts consider this notice requirement a mandatory pre-requisite for an individual to establish standing to bring a claim.  *Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014); *Ga. State Conference of the NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335-36 (N.D. Ga. 2012).  And its sufficiency is evaluated in light of the purpose for this requirement—which is to provide states in alleged violation of the act an attempt at compliance before facing litigation.  *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) ("Congress structured the notice requirement in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation.")  Accordingly, the allegations in the notice must be specific enough to identify the allegedly aggrieved individual and the actions-or-lack-thereof, which aggrieved him.  *See Scott,* 771 F.3d at 836.

PILF's letters do not identify any law, policy, or activity by the Secretary that could be considered non-compliance with the NVRA, much less one that aggrieved it.  As a preliminary matter, the letters overstate the obligations imposed by section 8 of the NVRA.  Section 8 requires that a state "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from official lists" by reason of the voter's death.  52 U.S.C. § 20507(a)(4),(b),(d),(e).  It does not require that Michigan immediately remove every voter who may have become ineligible (in fact, several provisions prohibit or could be read as prohibiting this), nor does it require that Michigan's program be exhaustive.  The NVRA requires a state

15

conduct a "general" program that makes a "reasonable effort" at list maintenance; federal courts have appropriately declined invitations to interpret the statute's plain language as requiring anything further.  *See Husted v. A. Phillip Randolph Inst.,* 138 S. Ct. 1833, 1847-48 (2018); *Bellitto v. Snipes*, 935 F.3d 1192, 1201, 1207 (11th Cir. 2019).  As explained above at pages 5 through 8, Michigan has such a program in place through statutes and policies for removing deceased voters from the rolls.

And PILF's letters provided no basis for a finding that Michigan's program, or even a law or policy through which it was carried out, does *not* comply with the NVRA.  PILF's so-called notice of violation letters only provide the barest explanations of what analytical steps were taken to compile the list of potentially deceased voters.  (See ECF No. 1-4, PageID.48-49; ECF No. 1-6, PageID.52; ECF No. 1-8, PageID.61-62; ECF No. 1-13, PageID.72-73.)  And the Bureau of Elections had to request the list of potentially deceased voters from PILF, and specifically requested the matching criteria for the voters, (Ex A, 9/30/20 BOE Email & Letter), which PILF did not provide.  PILF simply provided a list of 34,000 voter identification numbers. (Ex B, Screenshot Deceased Voter spreadsheet.)  But without additional matching data points for the allegedly deceased voters, there was no efficient way for the Bureau to verify PILF's results and discern whether there is any deficiency with the state's removal process.  *See, e.g., Public Interest Legal Foundation (PILF) v. Boockvar*, 495 F. Supp.3d 354, 360 (M.D. Pa, 2020) (observing in denying injunction that PILF had only provided Pennsylvania Secretary of State with a list of voter registration numbers: "Plaintiff did not provide middle initials, city of residence, voter affiliation, social security numbers, or driver's license numbers. We are not convinced that Defendant would be able to verify Plaintiff's list without more, let alone do so

16

before the election. These data points are integral to ensuring the proper voters are removed from the rolls, and their exclusion results in a slower, less efficient verification process.").

Further, in its complaint PILF alleges that its August 2021 analysis of the QVF identified 334 voter registration records that were created allegedly after the death of the voter. (ECF No. 1, Compl., PageID.15, ¶ 564.) However, none of PILF's previous letters identified this issue and gave notice of a violation, nor did PILF provide this list of voters to BOE before filing suit. As a result, these claims must be dismissed for lack of proper notice under the NVRA.

To date, PILF still has not provided Defendant's office with any additional matching criteria for its list of potentially deceased voters so that the state can verify or test PILF's results. And it did not give notice of the alleged voter registration records. Under the circumstances, Defendant submits that PILF's letters and the information provided fails to accomplish the purpose of the NVRA notice requirement and Count I of PILF's complaint should be dismissed.

### 2.     PILF's allegations fail to sufficiently allege Article III standing.

Even if PILF's letters satisfied the notice pre-requisite of the NVRA, this does not replace the requirement that the factual allegations in the complaint overcome the constitutional standing requirement, which is a threshold to this Court's jurisdiction. And PILF's complaint falls short of this.

First, PILF has not alleged a concrete and demonstrable injury. Again, an organizational plaintiff has Article III standing if it has suffered an injury in fact that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged conduct; and likely to be redressed by a favorable judgment. *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547-48 (2016). *See also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982). To obtain declaratory or injunctive relief, a claimant must show a present ongoing harm or imminent future harm. *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). Allegations of

17

injuries that merely amount to "generalized grievances about the conduct of Government." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 217 (1974), or "setback[s] to the organization's abstract social interests," *Havens Realty,* 455 U.S. at 379, will not suffice.  At the pleading stage, a plaintiff bears the burden of alleging facts establishing each element of standing.  *Spokeo*, 136 S. Ct. at 1547.

PILF's purpose is to "promote the integrity of elections in Michigan and other jurisdictions nationwide through research, education, remedial programs and litigation."  (ECF No. 1, Compl., PageID.2, ¶ 3.)_PILF alleges that Defendant's purported violations of the NVRA "have harmed and continue to harm and frustrate the Foundation's purpose of protecting the integrity of the electoral process, ensuring that accurate and current voter rolls are maintained, and educating the public about the same."  (ECF No. 1, PageID.3, Compl., ¶ 7.)  PILF further alleges that it has expended "significant time and money in Michigan seeking to rectify" Defendant's alleged "failure to clean up the voter rolls by removing the surfeit of deceased registrants from such rolls and has also forced the Foundation to divert its limited resources from other states with similar issues."  (*Id.*)  According to PILF, "[a]ll of these harms confer standing upon the Foundation to assert the claim raised in this case."  (*Id.*)

As alleged, PILF's claims of harm are hypothetical or speculative in that the research it has done and the money it has spent has resulted in a list that PILF itself identifies as "potentially deceased" voters whose registrations had not been properly cancelled.  In other words, PILF is not sure of the status of these alleged voters.  It could be that its entire list is incorrect.  As to PILF's diversion of resources claim, "it can no more spend its way into standing based on speculative fears of future harm that an individual can." *Shelby Advocates for Valid Elections v. Hargett,* 947 F.3d 977, 982 (6th Cir. 2020) (citation omitted).  PILF pleads "only backward-

18

looking costs, not the imminent future injury needed to establish standing for declaratory and injunctive claims like this one." (*Id*.)  Further, PILF did not divert resources from its mission to conduct research or ensure that accurate rolls are maintained or to prepare for litigation in this case.  These actions did not "divert resources from its mission.  That is its mission." (*Id*.)  *See also Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014) (rejecting claim of standing based on "diversion of resources" theory).  Thus, PILF has not alleged facts sufficient to create a concrete injury-in-fact, particular to PILF and sufficient to satisfy the standing requirement.

Second, a favorable ruling will not likely redress any alleged injury. "The relevant standard [here] is likelihood – whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Dewine,* 910 F.3d 842, 850-51 (6th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000).)  The concern is not so much with the Court's judicial decree but, rather, the "value of the judicial pronouncement," i.e., that it can serve as a "proper judicial resolution of a 'case or controversy'" as opposed to a mere advisory opinion.  *Id*. (internal citations omitted.)  In other words, the allegations of the complaint must demonstrate that PILF will personally benefit from this Court's decision.  *Id.*

The declaratory and injunctive relief sought by PILF is, essentially, a requirement that Defendant comply with section 8 of the NVRA.  (ECF No.1, Compl., PageID.19.)  An order requiring Defendant to comply with this law (if, in fact, this Court found that Defendant was not) would only require the implementation of a "general program that makes reasonable efforts to remove" the names of voters rendered ineligible by death.  52 U.S.C. § 20507(a)(3).  Section 8 of the NVRA does *not* require a state to implement an exhaustive program that immediately

19

removes every person ineligible for any reason, including death.  Thus, it is unclear that any favorable decision will personally benefit PILF.

In sum, the allegations of the complaint—even if true—do not establish standing.  PILF's notice letters do not provide adequate information that would alert Defendant to action or inaction that was allegedly not in compliance with the NVRA.  Moreover, even if notice was sufficient PILF has not identified any concrete, particularized injury-in-fact, fairly traceable to the Defendant's conduct, that would be redressable by a favorable decision in this Court.  PILF's allegations are insufficient to demonstrate standing over these claims and, accordingly, the complaint should be dismissed

**B.      PILF's complaint fails to state a claim for a violation of NVRA's list maintenance requirements.**

In addition to lacking standing to sue, PILF's complaint fails to state a claim upon which relief may be granted under NVRA's list maintenance provisions and must be dismissed for this reason as well.

Again, to survive dismissal, PILF's claim must be plausible.  *Bell Atl. Corp.*, 550 U.S. at 555.  The inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  Thus, in evaluating the sufficiency of PILF's pleadings, this Court may make reasonable inferences in the non-moving party's favor, "but [this Court is] not required to draw [P]laintiffs' inference." *Aldana*, 416 F.3d at 1248.  Conclusory allegations are "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681.

At bottom, PILF claims that Defendant Benson is in violation of NVRA simply because there may be deceased voters who remain identified on the QVF as registered voters.  It is somewhat unclear from PILF's pleadings exactly how many such voters PILF believes there to be as the number has gone down from 34,000 in its first letter to 25,975 in its complaint.  (ECF No. 1, Compl., PageID.14, ¶ 53.)

The NVRA does not require states to implement a specific program for removing voters or to immediately remove every voter who may have become ineligible.  Rather, a state must "conduct a *general program* that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant."  52 U.S.C. § 20507(a)(4)(A) (emphasis added).  As discussed above, Michigan has such a program, which involves comparisons of the SSDI to the QVF on a monthly, if not weekly, basis and then further maintenance activity by the local clerks.

In contrast to the reasonable procedure Michigan follows, based on public criteria that can be independently verified, PILF demands BOE investigate a list of approximately 34,000 (or 27,500 or 25,975) votes based on PILF's bare assertion that these registered voters are deceased.  But PILF is unwilling to disclose any actual evidence that any of these registered voters actually are deceased.  None of the information PILF provided to BOE, or has provide to this Court, does anything to show that the individuals PILF supposedly identified as deceased are actually the same individuals PILF claim are registered to vote.  PILF finding the gravestone of someone named John Smith does not prove that a currently registered voter named John Smith is the one who died.  Acting upon such information under these circumstances would have unreasonably jeopardized Michiganders' voting rights in contravention of NVRA's requirements.

Assuming for the sake of argument that PILF's 25,975 potentially deceased voters are, in fact, deceased, their continued presence on the QVF does not render Michigan's deceased voter removal program unreasonable and in violation of the NVRA. As of the filing of this brief, there are 8,055,353 registered voters in Michigan.[10] PILF's list of potentially deceased voters represents just 0.3 percent of registered voters maintained in the QVF. PILF alleges that of the 25,975, "23,663 registrants have been dead for five years or more, 17,479 registrants have been dead for at least ten years, and 3,956 registrants have been dead for at least twenty years." (ECF No. 1, Compl., PageID.2, ¶ 4.) In other words, the 25,975 potentially deceased voters are scattered over time. But according to public statistics,[11] over the last 20 years over 1.92 million people died in Michigan.[12] The 25,975 potentially deceased voters represent a tiny percentage of these deaths. As one court has observed, "the NVRA does not require perfection[.]" *PILF*, 495 F. Supp.3d at 359. And it certainly does not require election officials to divert limited public resources from using established protocols to identify and remove deceased voters to, instead, focus on a list of unknown provenance and accuracy. *See PILF*, 495 F.3d at 360 ("[E]ven assuming the highest quality control standards were in place in the creation of Plaintiff's list, we will not allow a private foundation to dictate for voter eligibility of thousands of Pennsylvania voters – Defendant has every right to verify this list before disenfranchising potentially eligible voters.") Acting upon such information under these circumstances would have unreasonably jeopardized Michiganders' voting rights in contravention of the Act's requirements.

---

[10] *See* MDOS, available online Voter registration statistics (state.mi.us).

[11] On a motion to dismiss, this Court may consider materials that are public records or otherwise appropriate for taking judicial notice without converting it to a summary judgment motion. *See New England Health Care Employee Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003).

[12] *See* MDHHS, Population, Live Births, Deaths Table, All Ages column, available at Population, Births, Deaths, Marriages & Divorces by Year (michigan.gov).

If anything, the fact that PILF's unproven estimate that 34,000 deceased registrants has dropped by nearly a quarter, to 25,975, in approximately a year tends to demonstrate that deceased voters are being reasonably identified and removed.  The existence of 25,975 "potentially" deceased voters on Michigan's roll does not render Michigan's voter removal program unreasonable or rise to the level of a violation of the NVRA.  That is not to say that the Secretary does not take her list maintenance duties seriously—she does—but the NVRA does not require a perfectly purged voter roll and certainly does not require disproving any unverified complaint a state receives.  It requires the state to make a "reasonable effort" to remove deceased voters.  Michigan is doing so, and PILF's own numbers actually confirm that to be the case.

No removal program will be perfect.  As noted above, it is not always possible to match SSDI records to voter records in the QVF because of missing information or errors.  Mistakes are going to occur because humans make mistakes, it is unavoidable.  PILF seems to suggest that it would be reasonable for state officials to haunt cemeteries to take pictures of gravestones or sift through credit history information of millions of voters.  But the NVRA does not require this type of effort.  In *Bellitto v. Snipes*, the Eleventh Circuit upheld as reasonable a Florida county's program for removing deceased voters, which relied on comparisons with the SSDI and Florida Health Department records, much like Michigan's process.  935 F.3d 1192, 1205-07 (11th Cir. 2019).  The plaintiff argued that it was unreasonable for the county "not to use additional available tools in order to identify deceased voters.  (*Id*. at 1207.)  The court noted that it was "plausible" that if the county had used additional tools it could have removed additional deceased voters.  (*Id*.)  But, as the court observed, "the NVRA only requires that [the] County make a reasonable effort, not an exhaustive one, and the Florida Health Department's records and the SSDI are reliable sources of information concerning registrant deaths. . . . The failure to use

duplicative tools or to exhaust every conceivable mechanism does not make [the defendant's] effort unreasonable." (*Id*.)

Moreover, it is far from clear that PILF's list is correct. While PILF may be convinced of the merits of its own analysis, their reference in the complaint to "post-death registration" is at least a possible indication that the people on their list may not, in fact, be dead. Even still, the unusual methods employed by PILF are not required by federal law.

Here, PILF's factual allegations do not plausibly set forth a violation of the NVRA. Indeed, the facts "do not permit the court to infer more than the mere possibility of misconduct," which is insufficient to show PILF is entitled to relief. *Iqbal*, 556 U.S. at 679. Accordingly, this Court should dismiss Count I.

## CONCLUSION AND RELIEF REQUESTED

For these reasons, Defendant Michigan Secretary of State Jocelyn Benson respectfully requests that this Honorable Court enter an Order dismissing Count I of the Complaint against her in its entirety and with prejudice.

Respectfully submitted,

DANA NESSEL
Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
(P55439)

Dated:  December 13, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document as well as via US Mail to all non-ECF participants.

> *s/Heather S. Meingast*
> Heather S. Meingast (P55439)
> Attorney for Defendant
> P.O. Box 30736
> Lansing, Michigan 48909
> 517.335.7659
> Email:  meingasth@michigan.gov
> (P55439)