UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PUBLIC INTEREST LEGAL FOUNDATION,

     Plaintiff,

v

JOCELYN BENSON, in her official capacity as
Michigan Secretary of State,

     Defendant.

No. 1:21-cv-00929

HON. ROBERT J. JONKER

_____

Kaylan Phillips
Noel Johnson
Charlotte M. Davis
Public Interest Legal Foundation
32 East Washington Street, Suite 1675
Indianapolis, Indiana 46204
317.203.5599
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org
cdavis@publicinterestlegal.org
_____/

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

**DEFENDANT JOCELYN BENSON'S ANSWER TO COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Michigan Secretary of State Jocelyn Benson, by her attorneys, states as follows for her answer to complaint for declaratory and injunctive relief:

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the action arises under the laws of the United States.  This Court also has jurisdiction under 52 U.S.C. § 20510(b) as the action seeks injunctive and declaratory relief under the NVRA.

**ANSWER:**     **The allegations in this paragraph are legal conclusions which require no response.  Further answering, Defendant does not challenge the Court's jurisdiction.**

2.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) because the Defendant resides in this district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response.  Further answering, Defendant does not challenge venue.**

**PARTIES**

3.      The Plaintiff, the Public Interest Legal Foundation, Inc., (the "Foundation") is a non-partisan, non-profit, public interest organization incorporated and based in Indianapolis, Indiana. The Foundation seeks to promote the integrity of elections in Michigan and other jurisdictions nationwide through research, education, remedial programs, and litigation.  The Foundation gas dedicated significant time and resources to ensure that voter rolls in the state of Michigan do not contain ineligible registrants.  The Foundation communicates with election officials about problems or defects found in list maintenance practices and about ways to improve those practices.  The Foundation relies on accurate voter rolls to conduct analyses and to educate the public in Michigan and across the nation about the integrity of their elections.

**ANSWER:    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

4.      The Foundation's analysis of Michigan's voter roll and verifiable death records reveals that, as of August 2021, 25,975 potentially deceased registrants are on Michigan's voter rolls. Of those, 23,663 registrants have been dead for five years or more, 17,479 registrants have been dead for at least ten years, and 3,956 registrants have been dead for at least twenty years.

**ANSWER:    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Defendant is unable to discern what Plaintiff means by "potentially deceased registrants."**

5.      Defendant Jocelyn Benson is the Michigan Secretary of State.  Secretary Benson is the chief election officer of Michigan for the purposes of the NVRA.  Mich. Comp. Laws § 168.21; Mich. Comp. Laws § 168.509n.  Secretary Benson is sued in her official capacity.

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response.**

6.      Because Defendant does not maintain accurate over rolls, the Foundation must spend more time and resources evaluating Michigan's rolls and attempting to correct the problems. The Foundation has spent many thousands of dollars reviewing Michigan's election procedures and documented failures to maintain an accurate and correct voter roll as required by the NVRA. Defendant's unlawful list maintenance program has forced the Foundation to incur substantial costs comparing Michigan's voter rolls to the Social Security Death Index, various commercial databases, and other sources in order to identify deceased registrants.

**ANSWER:    The allegations in this paragraph are denied for the reason that they are untrue.**

7.      Defendant's violations of the NVRA have harmed and continue to harm and frustrate the foundation's purpose of protecting the integrity of the electoral process, ensuring that accurate and current voter registration rolls are maintained, and educating the public about the same.  The Foundation's expenditure of significant time and money in Michigan seeking to rectify Defendant's failure to clean up the voter rolls by removing the surfeit of deceased registrants

3

from such rolls has also forced the Foundation to divert its limited resources from other states with similar issues.  All of these harms confer standing upon the Foundation to assert the claim raised in this case.

**ANSWER:    The allegations in this paragraph are denied for the reason that they are untrue.**

## STATEMENT OF FACTS AND LAW

8.    Section 8 of the NVRA requires Michigan to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of," *inter alia*, "the death of the registrant."  52 U.S.C. § 20507(a0(4)(A).

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

9.    Section 8 of the NVRA also requires that Michigan shall "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A).

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

10.    Although Section 8 of the NVRA generally restricts states from removing ineligible registrants from the voter rolls within 90 days of a primary or general election, Congress permitted the removal of registrants who have died.  52 U.S.C. § 20507(c)(2)(B)(i).  So has Michigan.  Mich. Comp. Laws § 168.509dd(2)(b).  Registrants who have died may be removed *at any time*.  See also U.S. Dep't of Justice, the National Voter Registration Act of 1993 (NVRA) Questions and Answers, available at https://www.justice.gov/crt/national-voter-registration-act-

1993-nvra ("This 90 day deadline does not, however, preclude removal of names at the request of the registrant, removal due to death of the registrant, removal due to criminal conviction or mental incapacity of the registrant as provided by State law, nor does the deadline preclude correction of a registrant's information.").

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

11.    Defendant is the chief election official of Michigan and is responsible for coordination of Michigan's responsibilities under the NVRA.  52 U.S.C. § 20509.

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

12.    Congress intended for the chief election official to be "responsible for implementing the state's function under the [NVRA]."  S. REP. No. 103-6, at 39 (1993).

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

13.    Although a state may assign certain tasks associated with the voter registration process to different officials in the state, the chief election official remains responsible at all times – pursuant to federal law – for coordinating and implementing the NVRA's myriad legal mandates.

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

14.    According to the U.S. Department of Justice, the chief state election official for NVRA purposes is a proper defendant in any statewide NVRA action.  See Statement of Interest of the United States at 7, Doc. 36, *Public Interest Legal Foundation v. Boockvar*, Civ. No. 1:20-cv-1905 (attached here as Exhibit 1).

**ANSWER:**   **The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

15.     Defendant's responsibility for coordinating with local election officials to ensure the removal of deceased electors from the voter rolls is a core component of her NVRA statutory obligation.  It is also mandated by the federal Help America Vote Act ("HAVA").  52 U.S.C. § 21083(a)(2)(A)(ii)(II).  For example, Michigan's State Plan under HAVA states that "[i]n order to provide local election officials the tools to comply with the National Voter Registration Act (NVRA), the State of Michigan enhanced the [Qualified Voter File] to automate the cancellation process...the QVA will automatically forward lists of registered voters subject to cancellation to each election official."

**ANSWER:**   **The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

### Michigan's Program for Removing Deceased Registrants

16.     Pursuant to Michigan law, Defendant "shall direct and supervise the establishment and maintenance of a statewide qualified voter file."  Mich. Comp. Laws § 168.509o(1).

**ANSWER:**   **The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

17.     Specifically, Michigan law requires Defendant to

> develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license...of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased.  The secretary of state shall make the canceled voter registration information under this section available to the clerk of each city or township to assist with the clerk's obligations under section 510.

Mich. Comp. Laws § 168.509o(4).

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

18.     Upon information and belief, Defendant and not any local election official is responsible for receiving and acting upon Social Security Death Index ("SSDI") information.  In response to a complaint filed by the Foundation against City of Detroit election officials regarding deceased registrants the Foundation identified, the defendants attached to a declaration an email form Rachel Clone, Data Analytics and Support Manager at the Department of State, Bureau of Elections.  A true and correct copy of the declaration and relevant attachment is included herein as Exhibit 2.  Specifically, Ms. Clone stated the following,

> To answer your earlier question regarding the Social Security Death Index and its role in voter registration file maintenance, I can confirm that the MI Secretary of State receives this data and through a comparison process updates records as deceased within the driver and State Personal ID file.  Through an automated process, the information interfaces with the Qualified Voter File in order to cancel corresponding voter registrations.

**ANSWER:    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Defendant admits that the Michigan Department of State receives the Social Security Death Index.**

19.     City of Detroit election officials also stated that they provided the State of Michigan with the potentially deceased registrant data provided by the Foundation.  According to the City of Detroit election officials, "The State discovered that in many cases, discrepancies between the information contained in the SSDI and the QVF has made it difficult to confirm the deaths of the voters at issue.  However, the State is continuing its investigation and is cancelling voters as deceased as it deems appropriate.  Exhibit 2 at 5.

**ANSWER:**    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Exhibit 2 is a lawsuit filed by Plaintiff in state court.

20.    Michigan law provides,

> At least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the country to the clerk of each city or township within the county.  The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors.

Mich. Comp. Laws § 168.510.

**ANSWER:**    The allegations in this paragraph are legal conclusions which require no response.

21.    According to Michigan law, Defendant "shall notify each clerk of the following information regarding residents or former residents of the clerk's city or township...(c) Death notices received by the secretary of state."  Mich. Comp. Laws § 168.509z.

**ANSWER:**    The allegations in this paragraph are legal conclusions which require no response.

22.    Additionally, Michigan law provides that local election officials "may conduct a house-to-house canvass or use such other means of checking the correctness of registration records as may seem expedient."  Mich. Comp. Laws § 168.515.

**ANSWER:**    The allegations in this paragraph are legal conclusions which require no response.

23.    The Michigan Election Officials' Manual is a document that "is designed to serve as a lasting information resource on election related matters."  Introduction, Michigan Election Officials' Manual, available at

https://www.michigan.gov/documents/sos/June_2011_Clerk_Accredi_Manual_Cover-

Content_362765_7.pdf (lass accessed November 3, 2021). Pursuant to the Michigan Election

Officials' Manual, local election officials are authorized to cancel registration records when, for

example, "The clerk receives or obtains information that the voter has died.  Sources: QVF inbox

notification; county clerk; *death notices published in newspaper; personal firsthand knowledge*."

Michigan Election Officials' Manual, Chapter 2, Page 20, available at

https://www.michigan.gov/docuemnts/sos/II_Voter_Registration_265983_7.pdf (last accessed

November 3, 2021) (emphasis added).

**ANSWER:     Admitted**.

### Michigan's List Maintenance Programs and Activities are Unreasonable

24.     As explained by the U.S. Department of Justice, "the question whether the general

program of list maintenance [a chief election official] undertakes in fact amounts to a 'reasonable

effort' to remove ineligible voters under Section 8 of the NVRA goes beyond the simple

existence of state laws and procedures, to include consideration of the actual efforts undertaken

pursuant to those laws and procedures."  Exhibit 1 at 13.

**ANSWER:     The allegations in this paragraph are legal conclusions which require no**

**response.**

25.     Michigan's list maintenance activities have proven unreasonably inadequate to

identify many registrants who are deceased, some of which have been deceased for a significant

number of years and been published in newspaper death notices.  The Foundation was able to

find copies of death notices and pictures of grave markers for individuals included on the

Foundation's list of likely deceased registrants.  See Exhibit 3 (with some information redacted

for purposes of this filing).

**ANSWER:    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Defendant denies that their list maintenance activities are inadequate for the reason that the allegation is untrue.**

26.    Michigan's activities for removing the names of deceased registrants from the list of eligible voters, overseen by the Defendant in her capacity as the state's chief election official, are unreasonable and inadequate to meet the obligations required by the NVRA.  Defendant is not following the existing federal and state laws and procedures, and to the extent she is, her efforts are inadequate.  Among the evidentiary bases for this allegation are (a) the presence of significant numbers of registrants on the rolls who have been deceased for many years or even decades and (b) Defendant's refusal to act despite specific information about deceased active registrants being brought to her attention.  Defendant's actions and inactions in this regard constitute a clear failure to conduct reasonable list maintenance under the NVRA.

**ANSWER:    The allegations are denied for the reason that they are untrue.**

**Thousands of Deceased Registrants Remain on the Voter Rolls**

27.    The Defendant's failures have occurred over an extended period of time.  The Foundation, in turn, has sought to remedy these failures over an extended period of time.  The Foundation first analyzed the accuracy of Michigan's voter rolls with respect to deceased registrants in early 2020 after obtaining a copy of the State's Qualified Voter File as of September 2019.

**ANSWER:    The allegation that Defendant has failed to uphold her duties is denied for the reason that it is untrue, and the Defendant neither admits nor denies the remainder of**

**the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

28.     The Foundation's research sampled registrants classified as "active."  Under Michigan law, Defendant "shall create an inactive voter file."  Mich. Comp. Laws § 168.509r(5).  A registrant appears on the inactive voter file if he or she was "sent a notice under section 509aa to confirm the elector's residence information or if an elector does not vote for 6 consecutive years."  Mich. Comp. Laws § 168.509r(6).

**ANSWER:    Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  The citations to Michigan law are legal conclusions which require no response and the statutes speak for themselves.**

29.     A registrant listed in the inactive voter file "remains eligible to vote and his or her name must appear on the precinct voter registration list."  Mich. Comp. Laws § 168.509r(7).

**ANSWER:    The allegations in this paragraph are legal conclusions which require no response, and the statute speaks for itself.**

30.     The Foundation procured a data analytics expert to identify active status registrants who are deceased in a sample study.  Because the state of Michigan does not publish the full dates of birth of registrants on the QVF, the data analytics expert first cross-referenced the voter registration file provided by Defendant with commercial databases (e.g., credit reporting agencies and other licensed databases) to ascertain full dates of birth.  The expert also checked for evidence of commercial activity to help limit the possibility of false positives.  If an individual was found to have had any recent financial activity, the expert went no further in trying to determine if the individual is deceased and assumed the individual to be alive.

11

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

31.    The data analytics expert then took the sampling of active registrants with no recent commercial activity ("Registrant Sample #1") and sent the names, dates of birth, and addresses for those registrants to a federally licensed database vendor which has access to the Social Security Administration's databases.  After matching Social Security Numbers to Registrant Sample #1, the resulting list was examined against the Social Security Death Index ("SSDI")[1] to identify the names of those registrants who are deceased.  This process identified 34,000 potentially deceased registrants on Michigan's voter rolls.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

32.    In a letter dated September 18, 2020, the Foundation alerted Defendant to its research and findings, including the fact that approximately 34,000 registrants appeared to be deceased.  This letter also served as statutory notice to Defendant that Michigan was in violation of the NVRA, 52 U.S.C. § 20510(b).  See Exhibit 4 ("Notice Letter").

**ANSWER**:    **Defendant admits receiving a letter from PILF on or about September 24, 2020.  Defendant denies any violation of NVRA for the reason that the allegation is untrue.**

---

[1] Although extremely rare, the SSDI does occasionally include the names of individuals who have not died.  The data analytics expert hired by the Foundation seeks to guard against this by further comparing the names of individuals on the SSDI to obituaries and other publicly available sources of deceased individuals (e.g., credit reporting agencies).  Anyone with commercial activity following a reported date of death is eliminated as well.

**Whether that letter served any kind of notice is a legal conclusion that requires no response.**

33.     The Notice Letter was sent to Defendant via U.S. Postal Service (USPS) certified mail with return receipt requested.  According to USPS, the Notice Letter was delivered and signed for on September 21, 2020.  See Exhibit 5, USPS certified mail delivery confirmation.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Defendant admits receiving the letter described in its answer to paragraph 32.**

34.     In response to the Notice Letter, Defendant asked the Foundation for additional information about its methodology, which the Foundation provided on October 5, 2020.  Due to the importance of this issue and the imminence of the November 2020 election, the Foundation provided the Defendant a spreadsheet listing the voter ID numbers of all 34,000 registrants the Foundation identified.  See Exhibit 6, Correspondence dated October 5, 2020.[2]

**ANSWER**:    **Defendants admit receiving the correspondence attached as Exhibit 6. Defendant denies that Plaintiff provided the requested information about its methodology.**

35.     As an additional effort, the Foundation sought to purchase an updated copy of the QVF for the entire state of Michigan from Defendant's office.  The Foundation's request was dated September 21, 2020, but it was not acknowledged as received by Defendant's office until the Foundation sent additional correspondence on September 29, 2020.  See Exhibit 7, Email correspondence.  In response to the Foundation's request for expedited processing, Defendant's

---

[2] In an abundance of caution regarding the potential disclosure of personally identifying information, the Foundation is not attaching copies of the spreadsheets provided to the Defendant herein.

office informed the Foundation that relevant staff at the Office of the Secretary of State was

"only in the office on Mondays."  Exhibit 7 at 2.  To ensure that it received the requested data in

a timely manner, a Foundation representative drove from Indianapolis to Defendant's office on

October 5, 2020 to pay for and retrieve the requested data.  Exhibit 7.

**ANSWER**:   **The e-mail correspondence attached as Exhibit 7 speaks for itself, and to**

**whatever extent the allegation adds to or subtracts from the content of the correspondence,**

**it is denied as untrue.**

36.     The Foundation again hired a data analytics expert to identify deceased registrants.  The

Foundation incurs costs based on the number of registrations examined.  In order to not simply

duplicate prior work and in order to ascertain whether not-yet-identified deceased registrants are

in the QVF, the Foundation altered its research in two ways.  First, it requested that the data

analytics expert research all individuals who registered after October 1, 2019 as those individuals

would not have been included in the foundation's previous copy of the QVF.  Second, the

Foundation requested that the data analytics expert build a sample eventually totaling 3.2 million

registrants who fit the following criteria: 1) they registered to vote after October 1, 2019; 2) they

are listed as inactive or "CHA" status; or 3) they did not show recent financial activity from

credit reporting bureaus for an extended period of time leading up to the study.

**ANSWER**:   **Defendant neither admits nor denies the allegations in this paragraph due to**

**lack of knowledge and information sufficient to form a belief as to the truth of the matter**

**asserted.**

37.     The data analytics expert then took that list of 3.2 million registrants to a federally

licensed database vendor which has access to the Social Security Administration's databases.

After matching Social Security Numbers to registrants, the resulting list was examined against

the SSDI[3] to identify the names of those registrants who are deceased.  This process identified more than 27,500 potentially deceased registrants out of the examined subset of Michigan's QVF.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

38.    The Foundation alerted the Defendant to these additional findings on November 25, 2020.  See Exhibit 8.

**ANSWER**:    **The e-mail correspondence attached as Exhibit 8 speaks for itself, and to whatever extent the allegation adds to or subtracts from the content of the correspondence, it is denied as untrue.  Defendant admits receiving the letter attached as Exhibit 8.**

39.    On December 11, 2020, the Foundation requested the opportunity to inspect records pursuant to the NVRA concerning Defendant's efforts to remove deceased registrants from the QVF.  The Foundation stated its intention to conduct the inspection on December 18, 2020.  See Exhibit 9.

**ANSWER**:    **The e-mail correspondence attached as Exhibit 9 speaks for itself, and to whatever extent the allegation adds to or subtracts from the content of the correspondence, it is denied as untrue.**

40.    After multiple attempts to reach Defendant's office, the Foundation received an email from Defendant's office late on December 17, 2020 denying the Foundation's request to inspect

---

[3] To improve the confidence of its matches, the data analytics expert hired by the Foundation further compares the names of individuals on the SSDI to, where available, obituaries and other publicly available sources of deceased individuals (e.g., credit reporting agencies).  Anyone with commercial activity following a reported date of death is eliminated as well.

documents in person on December 18, 2020.  See Exhibit 10.  In the same email, Defendant's representative stated that Defendant's office is "still awaiting your matching criteria, which was requested on September 30th" even though the Foundation provided the requested information on October 5, 2020.  See Exhibit 6.

**ANSWER**:    **The e-mail correspondence attached as Exhibit 8 speaks for itself, and to whatever extent the allegation adds to or subtracts from the content of the correspondence, it is denied as untrue.  Further answering, Defendant also denies that Plaintiff provided the requested information in its October 5, 2020 letter for the reason that the allegation is untrue.**

41.    On December 18, 2020, the Foundation informed Defendant that she was in violation of the NVRA for failing to permit inspection and duplication of public records as required by 52 U.S.C. § 20507(i).  See Exhibit 11.

**ANSWER**:    **Defendant neither admits nor denies the allegations in paragraph 41 for the reason that the document speaks for itself.**

42.    The Inspection Notice Letter was sent to Defendant via email and U.S. Postal Service (USPS) certified mail with return receipt requested.  On December 18, 2020, the Foundation received an email response from Defendant states, "Thank you for contacting my office.  Your message is important to me.  This email confirms I have received your correspondence.  Please know my staff and I read every email and appreciate your patience as we respond to your message."  According to USPS, the Inspection Notice Letter was delivered and signed for on December 23, 2020.  See Exhibit 12, Email and USPS certified mail delivery confirmation.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter**

**asserted. Further answering, Defendant admits receiving the correspondence attached as Exhibit 11.**

43. Defendant did not respond to the Inspection Notice letter.

**ANSWER**: **Defendant admits that, through inadvertent oversight, a response to Exhibit 11 was not issued.**

44. On January 13, 2021, the Foundation sent a letter to the Defendant reiterating the information it provided on October 5, 2020. The Foundation included a spreadsheet listing the voter registration numbers of the registrants it identified in its most recent research so that Defendant could review the findings. See Exhibit 13.

**ANSWER**: **Defendant admits only that they received the correspondence attached as Exhibit 13. Defendant denies that Exhibit 13 provided the information requested about Plaintiff's methodology.**

45. Defendant did not reply to the January 13, 2021 correspondence from the Foundation.

**ANSWER**: **Defendant admits that, through inadvertent oversight, a response to Exhibit 13 was not issued.**

**Defendant Acknowledges Pattern of List Maintenance Failures, But Does Not Address the Foundation's Concerns**

46. On January 28, 2021, Defendant issued a press release concerning so-called "ongoing voter registration list maintenance." Press Release, Secretary Benson continues to bolster election security (Jan. 28, 2021), attached as Exhibit 14. Specifically, Defendant references "approximately 177,000 voter registrations slated for cancellation because the state has reason to believe the voter has moved away from the registration address." Nowhere in this press release does Defendant reference list maintenance because of the death of the registrant. There is no reason to believe that the failures identified by the Foundation have been corrected.

**ANSWER**:    **Defendant neither admits nor denies the allegation because the press release speaks for itself.  Further answering, Defendant denies that Plaintiff has demonstrated any failure to perform list maintenance required by NVRA.**

47.    In the same press release, Defendant stated, "The work that we are doing now will ensure the list of registered voters, which had gone over a decade without sufficient comprehensive efforts to ensure its accuracy, is updated and modernized with methods to promote integrity and prevent any eligible voter from disenfranchisement."  Exhibit 14 at 2.  Upon information and belief, the work to which Defendant refers are the efforts outlined in the press release regarding registrants who have moved, not any list maintenance efforts based on the death of the registrant. Even if the press release purports to address deceased registrants, the efforts were a failure.

**ANSWER**:    **Defendant neither admits nor denies the allegation because the press release speaks for itself.  Further answering, Defendant denies that Plaintiff has demonstrated any failure to perform list maintenance required by NVRA.**

48.    To confirm the Foundation's understanding that Defendant still had not corrected list maintenance efforts based on the death of the registrant in light of the January 28, 2021 announcement, the Foundation accessed the Defendant's list of 177,000 voter registrations slated for cancellation and compared it against the Foundation's latest sampling of approximately 27,500 potentially deceased registrants.  The Foundation found no pattern of overlapping records to indicate that registrants within the collection of 27,500 were within the listing of 177,000 officially slated for removal.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

**The Foundation's Efforts Following the November 2020 Election**

49.    To provide additional confirmation that Defendant had not corrected her list maintenance failures based on the death of the registrant following the November 2020 election, the Foundation purchased, *for the third time*, an updated QVF for the entire state of Michigan from Defendant's office in March 2021.  Again, to ensure that it received the requested data in a timely manner, a Foundation representative drove to Defendant's office to pay for and retrieve the requested data.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

50.    The Foundation then had the data analytics expert compare the list of likely deceased registrants sent to Defendant in November 2020 (Exhibit 8) against the March 2021 QVF file. The Foundation did so to ascertain whether any individuals previously identified by the Foundation as deceased had since been removed.  The Foundation did not expand its research to ascertain whether *additional* registrants were deceased.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

51.    As a result of this analysis, the Foundation confirmed that all of the more than 27,500 potentially deceased registrants previously identified out of the examined subset of Michigan's QVF *remained on the rolls* as of March 1, 2021.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter**

**asserted.  Further answering, Defendant is unable to discern what Plaintiff means by**
**"potentially deceased registrants."**

52.     Then, in August 2021, the Foundation *for the fourth time* purchased an updated copy of

Michigan's QVF to verify its previous research.  As it did before, the Foundation had the data

analytics expert compare the list of likely deceased registrants sent to Defendant in November

2020 (Exhibit 8) against the updated QVF file.  Again, the Foundation did not expand its

research to ascertain whether *additional* registrants were deceased.

**ANSWER:     Defendant neither admits nor denies the allegations in this paragraph due to**
**lack of knowledge and information sufficient to form a belief as to the truth of the matter**
**asserted.**

53.     As a result of this analysis, the Foundation confirmed that 25,975, or 94 percent of the

more than 27,500 potentially deceased registrants previously identified out of the examined

subset of Michigan's QVF *remained on the rolls* as of August 5, 2021.  The 25,975 consisted of

24,645 active registrants and 1,330 inactive of "CHA" registrants.

**ANSWER:     Defendant neither admits nor denies the allegations in this paragraph due to**
**lack of knowledge and information sufficient to form a belief as to the truth of the matter**
**asserted.**

54.     The foundation's August 2021 analysis also identified registrations where dates of death

per the SSDI preceded dates of registration as shown in the official QVF extract.  These

sequence conflicts are distributed throughout time and do not appear to heighten at any particular

point.  The August 2021 analysis ultimately found 334 registration records established after

death – 15 of those occurred in year 2020.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.**

55.    Without further inquiry, there is no way to know for certain whether these post-death registrations are the result of identity theft, data input error, or some other reason.[4]  But this kind of issue would not arise if Michigan cross-referenced new registrations to the SSDI.  With such a high prevalence of apparent post-death registrations, it is only reasonable to incorporate (and unreasonable to not incorporate) SSDI cross-references in the registration process.

**ANSWER**:    **Defendant denies the allegations in this paragraph for the reason that they are untrue.  Further answering, what Plaintiff describes as "post-death registrations" may also be valid registrations for individuals with the same or similar names, or Plaintiff may be mistaken with its judgment as to who is dead in the State of Michigan.**

56.    The Foundation's findings merit investigation and action by the Defendant.  Litigation brought by the Foundation in Pennsylvania shortly before the 2020 General Election revealed more than 100 instances of the same sequence conflict.  In early 2021, a Pennsylvania widower was indicted for allegedly impersonating his wife by registering to vote after she died and requesting an absentee ballot.  The deceased wife appeared on the Foundation's list of active registrants provided to Pennsylvania.  The man is accused of impersonating his deceased wife in

---

[4] Michigan, like many other states, employs a system of inserting fictitious or placeholder dates into the qualified voter file.  A standardized date of "1-1-1900" can be seen within the date of registration field when the actual date is not kept on record.  Within the 25,975 deceased list from August 2021, over 2,000 show placeholder dates of registration.  No registrants showing placeholder data were counted in the sequence conflict total.

the final days of the 2020 Election, despite her death in 2013.[5]  The deceased was credited for voting absentee during the 2020 General Election.

**ANSWER**:    **Defendant neither admits nor denies the allegations in this paragraph due to lack of knowledge and information sufficient to form a belief as to the truth of the matter asserted.  Further answering, Defendant is unable to discern what Plaintiff means by the statement that their "findings merit investigation," or how that relates to any alleged violation of NVRA.**

57.    Defendant cannot justify her failures by pointing to a state statute or practice delegating to local election officials the responsibility for removing deceased registrants from the voter rolls.  Under the NVRA, it is the obligation of Defendant to conduct a reasonable program to remove the names of deceased registrants from the state's list of eligible registrants.  Defendant has failed to fulfill her legal requirement in this regard, and she cannot avoid her culpability by citing to state law or procedures that might allegedly complicate her task or seek to thrust the duties assigned to her under federal law to one or more third parties.

**ANSWER**:    **Defendant denies any "failures" to perform list maintenance activities required by NVRA because the allegation is untrue.**

58.    Further, Defendant's obligation to maintain accurate voter rolls necessitates that accurate data has been entered.  For example, if a date of birth has been entered incorrectly, then any list maintenance attempted thereafter cannot be effective.

**ANSWER**:    **The allegations in this paragraph are legal conclusions which require no response.**

---

[5] "South Park man charged with casting ballot in dead wife's name" Pittsburgh Post-Gazette (Jan. 29, 2021), available at https://www.post-gazette.com/news/crime-courts/2021/01/29/voter-fraud-francis-presto-south-park-republican-election-ballot-dead-wife/stories/202101290136.

59.     Having a process in place that systematically removes deceased registrants is not just a good idea, it is the law.  52 U.S.C. § 20507(a)(4)(A).  For the Foundation to be able to identify more than 25,000 deceased registrants on a conservative sample of the QVF it examined, and for Defendant to fail to act upon the information provided by the Foundation over the course of many months, demonstrates emphatically that Michigan has failed to reasonably implement and/or conduct a systematic list maintenance program that complies with federal law requiring deceased electors to be removed from the voter rolls.

**ANSWER**:    **The allegations in this paragraph are legal conclusions which require no response.  Further answering, Defendant affirmatively states that it has a process for removing deceased registrants as required by 52 U.S.C. §20507(a)(4)(A).**

60.     The NVRA's requirement that each state make a reasonable effort to remove the names of deceased registrants from their list of eligible voters also necessitates that the state consider and act upon credible data from sources outside its normal procedures, including but not limited to SSDI-refined information provided by the Foundation.

**ANSWER**:    **The allegations in this paragraph are legal conclusions which require no response.**

**Plaintiff's Statutory Right to Bring this Action Under the NVRA**

61.     The Foundation is entitled to bring this civil action pursuant to Section 11(b)(2) of the NVRA, 52 U.S.C. § 20510(b)(2), because the Foundation provided statutory notice to Defendant, Michigan's chief election official, that Michigan was in violation of the NVRA.  See Exhibits 4 and 11.  Following the receipt of the Foundation's formal Notice Letter, the Defendant failed to timely correct Michigan's NVRA violations by conducting reasonable list maintenance to ensure that deceased registrants were timely removed from Michigan's voting rolls.

**ANSWER**: The allegations in this paragraph are legal conclusions which require no response.

## COUNT I

### Violation of the NVRA: Failure to Conduct List Maintenance

62. The Foundation re-alleges paragraphs 1 through 61 as if fully stated herein.

**ANSWER**: **Defendant re-states and incorporates by reference their responses to paragraph 1-61.**

63. Defendant has failed to make reasonable efforts to conduct voter list maintenance programs that ensure that the deceased do not remain registered to vote, in violation of Section 8 of NVRA, 52 U.S.C. § 20507.

**ANSWER**: **The allegations in this paragraph are legal conclusions which require no response. Further answering, Defendant denies failing to conduct voter list maintenance in violation of NVRA for the reason that the allegation is untrue.**

64. Defendant's failure has not been corrected within 20 days of the Foundation's notice of the violation on September 18, 2020. 52 U.S.C. § 20510(b)(2) ("If the violation is not corrected … within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.")

**ANSWER**: **The allegations in this paragraph are legal conclusions which require no response. Further answering, Defendant denies failing to conduct voter list maintenance in violation of NVRA for the reason that the allegation is untrue.**

65. Defendant's list maintenance programs and activities have demonstrably failed to remove thousands of long-deceased registrants from the state's list of eligible registrants. Whatever

efforts are being made by Defendant, they are unreasonable within the meaning of the NVRA because they are demonstrably not working.  The NVRA does not simply require a percentage or portion of dead registrants to be removed, it requires a program that actually reasonable detects dead registrants and removes them.  When more than 25,000 deceased registrants are identified on the QFV and not removed for an extended period of years, the list maintenance program is not only unreasonable, it is failing.

**ANSWER**:     **Defendant denies the allegation for the reason that it is untrue.**

66.     The Foundation has suffered an irreparable injury as a direct result of Defendant's violation of Section 8 of the NVRA, 52 U.S.C. § 20507.  Defendant's failure to comply with the NVRA has aggrieved and continues to aggrieve the Foundation by impairing its essential and core mission of fostering compliance with federal election laws and promoting election integrity. Defendant's failure to comply with the NVRA has caused and continues to cause the Foundation pecuniary injury, perceptibly impairs the Foundation's mission, and frustrates the organization's purposes.  See *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369 (1982).

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no response.  Further answering, Defendant denies failing to conduct voter list maintenance in violation of NVRA for the reason that the allegation is untrue.**

67.     The Foundation has no adequate remedy at law.

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no response.**

## COUNT II

### Violation of the NVRA: Failure to Allow Inspection of Records and Data

68.     The Foundation re-alleges paragraph 1 through 67 as if fully stated herein.

25

**ANSWER**:     **Defendant re-states and incorporates by reference their responses to paragraph 1-67.**

69.     Defendant has failed to allow the Foundation to inspect records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of Michigan's official lists of eligible voters in violation of Section 8 of the NVRA, 52 U.S.C. § 20507(i).

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no response.**

70.     Defendant's failure has not been corrected within 90 days of the Foundation's notice of the violation on December 18, 2020.  52 U.S.C. § 20510(b)(2) ("If the violation is not corrected within 90 days after receipt of a notice under paragraph (1) … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.")

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no response.**

71.     The Foundation has suffered an informational injury as a direct result of Defendant's violations of Section 8 of the NVRA because the Foundation does not have the data and records requested.  The NVRA confers upon the Foundation a right to information, and by denying that information to the Foundation, the Defendants have caused a concrete injury to the Plaintiff. This violation also prevents the Foundation from engaging in its research, educational, and remedial activities.

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no response.**

72.     The foundation will continue to be injured by Defendant's violations of Section 8 of the

NVRA unless and until Defendant is enjoined from continuing to violate the law.

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no**

**response.**

73.     The Foundation has no adequate remedy at law.

**ANSWER**:     **The allegations in this paragraph are legal conclusions which require no**

**response.**


## DEFENDANTS' SPECIAL AND/OR AFFIRMATIVE DEFENSES

NOW COMES Defendant Secretary Benson, by and through her attorneys, and for her

Special and/or Affirmative Defenses states:

1.     One or more of Plaintiff's claims fail to state a claim upon which relief may be

granted and are, therefore, subject to dismissal as a matter of law.

2.     Plaintiff lacks standing and, therefore, this Court is without jurisdiction over this case.

3.     Plaintiff's claims may be barred in whole, or in part, by governmental immunity,

including but not limited to absolute immunity, qualified immunity, and/or Eleventh

Amendment immunity.

4.     Plaintiff's request for injunctive relief fails to state a claim on which relief can be

granted, therefore warranting dismissal as a matter of law because, among other

things, Plaintiff alleges, at best, a mere apprehension of injury, and an alleged failure

to carry out discretionary activities without any allegation that Plaintiff had a clear

legal right to the performance of a specific duty by either Defendant.  Moreover, the

requested injunctive relief is contrary to the public interest and must, therefore, be denied.

5.      Any claim for money damages is speculative and therefore, must be denied.

6.      To the extent any assertion contained in Defendant's above answers constitutes an affirmative defense, the same is incorporated by reference as if fully set forth herein.

7.      Defendants reserve the right to raise any additional affirmative defenses that Defendants may have following the completion of discovery herein.

Respectfully submitted,

DANA NESSEL
Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendant Benson
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
(P55439)

Dated:  December 13, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing of the foregoing document as well as via US Mail to all non-ECF participants.

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

28