UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PUBLIC INTEREST LEGAL
FOUNDATION,

      Plaintiff,                              Case No. 1:21-cv-929

v.                                         HON. JANE M. BECKERING

JOCELYN BENSON,

      Defendant.

_____/

## OPINION AND ORDER

Plaintiff Public Interest Legal Foundation (PILF) initiated this case under the National Voter Registration Act (NVRA), 52 U.S.C. § 20507, against Defendant Jocelyn Benson in her official capacity as Michigan's Secretary of State. PILF seeks declaratory and injunctive relief for two alleged violations of the NVRA: "Failure to Conduct List Maintenance" (Count I) and "Failure to Allow Inspection of Records and Data" (Count II). Now pending before the Court are three motions: (1) Secretary Benson's Motion to Dismiss Count I (ECF No. 10); (2) a Motion to Intervene by the Detroit/Downriver Chapter of the A. Philip Randolph Institute (APRI), the Michigan Alliance for Retired Americans (MiARA), and Rise Inc. (hereinafter collectively the "Proposed Intervenors") (ECF No. 18); and (3) the Proposed Intervenors' Motion for Leave to File a Reply (ECF No. 31). Having considered the submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the following reasons, the Court denies Secretary Benson's motion to dismiss, grants the Proposed Intervenors leave to file a reply, and denies their motion to intervene.

# I.  BACKGROUND

## A.  Legal Context

### 1.    The NVRA

To "reinforce the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements, Congress passed the National Voter Registration Act in 1993." *Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 835 (6th Cir. 1997).  The Act requires states to offer voter registration by mail, by application in person at all offices in the state providing public assistance or administering state-funded programs that primarily provide services to persons with disabilities, and by application in person while applying for a motor vehicle driver's license. *Id.* (citing the predecessor to 52 U.S.C. § 20503).  The Act also sets forth requirements for removing registrants from the voter registration roll because of the death of the registrant or a change in the residence of the registrant. *Id.* (citing the predecessor to 52 U.S.C. § 20507(a)(4)(A), (B)).  The Act became effective in Michigan on January 1, 1995.  *Id.*

Section 8 of the NVRA, which is the section at issue in this case, requires Michigan to conduct a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of," inter alia, "the death of the registrant."  52 U.S.C.  §  20507(a)(4)(A).  Although §  8 generally restricts states from removing ineligible registrants from the voter rolls within 90 days of an election, 52 U.S.C. § 20507(c)(2)(A), the 90-day deadline does not apply to removing registrants who have died, 52 U.S.C. § 20507(c)(2)(B)(i). The NVRA also requires that each state maintain and make available for public inspection certain records concerning the implementation of its voter registration activities under the Act.  52 U.S.C. § 20507(i).  Section 11(a) of the NVRA provides for a civil enforcement action by the Attorney General, 52 U.S.C. § 20510(a), and a "private right of action," 52 U.S.C. § 20510(b).

2

2.      **Michigan's Election Law**

Secretary Benson is the chief election official of Michigan and is responsible for coordination of Michigan's responsibilities under the NVRA and Michigan's Election Law. 52 U.S.C. § 20509; MICH. COMP. LAWS § 168.509n. With respect to the deaths of registered voters, § 509o requires the Secretary of State to

> develop and utilize a process by which information obtained through the United States Social Security Administration's death master file that is used to cancel an operator's or chauffeur's license . . . or an official state personal identification card . . . of a deceased resident of this state is also used at least once a month to update the qualified voter file to cancel the voter registration of any elector determined to be deceased. The secretary of state shall make the canceled voter registration information under this subsection available to the clerk of each city or township to assist with the clerk's obligations under section 510.

MICH. COMP. LAWS § 168.509o(4). *See also* MICH. COMP. LAWS § 168.509z(c) ("The secretary of state shall notify each clerk of the following information regarding residents or former residents of the clerk's city or township: . . . [d]eath notices received by the secretary of state.").

Secretary Benson represents that based on these laws, "each week the Michigan Department of State uses information from the Social Security Death index [SSDI] to cancel the records of individuals in the [Qualified Voter File (QVF)] who have died" (ECF No. 11 at PageID.102). However, "in some cases, this process may not identify an individual who has died, in which case that individual will stay on the voter rolls until the local election clerk identifies the deceased individual's record and cancels it" (*id.*). Secretary Benson indicates that the identification failure "can happen when there is insufficient matching information for a voter between the SSDI and the record in the QVF" (*id.*). According to Secretary Benson, a registration generally will "only be automatically cancelled if the full name, full date of birth, and social security number match" (*id.*).

Additionally, "[a]t least once a month, the county clerk shall forward a list of the last known address and birth date of all persons over 18 years of age who have died within the county to the clerk of each city or township within the county.  The city or township clerk shall compare this list with the registration records and cancel the registration of all deceased electors."  MICH. COMP. LAWS § 168.510.   Secretary Benson indicates that local clerks are instructed that they are authorized to cancel a voter's registration if the "clerk receives or obtains information that the voter has died" through "QVF inbox notification" from the "county clerk," from "death notices published in [a] newspaper," or from "personal firsthand knowledge" (ECF No. 11 at PageID.103, quoting Michigan Election Officials' Manual).

Last, a "clerk may conduct a program . . . to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township."  MICH. COMP. LAWS § 168.509dd(1).  Such a program must be uniformly administered and must comply with the NVRA, including the requirement that any program be concluded 90 days or more before a federal election, except for removals conducted at the request of a voter, upon the death of a voter, or upon notice that the voter has moved and applied for registration in a different jurisdiction.  MICH. COMP. LAWS § 168.509dd(1), (2)(a)–(c).  To conduct a removal program, a local clerk may conduct a house-to-house canvass, send a general mailing to voters for address verifications, participate "in the national change of address program established by the postal service," or use "[o]ther means the clerk considers appropriate."  MICH. COMP. LAWS § 168.509dd(3).

### B.  Factual Background & Procedural Posture

PILF, which is incorporated and based in Indianapolis, Indiana, describes itself as a "non-partisan, non-profit, public interest organization" that "seeks to promote the integrity of elections

in Michigan and other jurisdictions nationwide through research, education, remedial programs, and litigation" (Compl. [ECF No. 1] ¶ 3).  On September 18, 2020, about six weeks before the November 2020 presidential election, PILF wrote a letter to Secretary Benson to serve as its "statutory notice pursuant to 52 U.S.C. § 20510(b) of violations" of the list maintenance requirements of "Section 8 of the NVRA, 52 U.S.C. § 20507" and requesting an "immediate meeting" (Ex. 4 to Compl., ECF No. 1-4 at PageID.48–50).  PILF opined in the letter that "ultimately only your office can conclusively determine whether the registrants are indeed deceased and whether voting credits were accurately issued for some registrants in subsequent elections" (*id.*).  On September 29, 2020, staff from the Secretary's Bureau of Elections (BOE) responded to PILF's September 18 letter, requesting that, in order for the Secretary to determine "how to best proceed," PILF "provide a written description of the matching criteria used by [PILF] to substantiate" its claims "as well as electronic lists of voters PILF has identified as 'potentially deceased with an active registration'" (Ex. A to Motion, ECF No. 11-2, quoting PILF's 9/18/20 Letter).

On October 5, 2020, PILF responded to the BOE's letter by providing a "spreadsheet [ ] identifying the voter ID numbers of the registrants [PILF] identified" and indicating that PILF had compared registrants against the SSDI and matched full names, full dates of birth, Social Security Numbers, and credit address history information, which revealed "27,000 records of concern," with the remainder matching "other verifiable death record sources" (Ex. 6 to Compl., ECF No. 1-6 at PageID.52).

On November 25, 2020, which Secretary Benson indicates was two days after Michigan had certified the results of the November 2020 general election (ECF No. 11 at PageID.107), PILF sent a "follow-up" letter, indicating that it had not received a response to its October 5 letter and

that it had purchased another copy of the QVF in October and performed the same comparisons, which indicated that "over 27,500 voters" are on the QVF despite SSDI indications that they are deceased (Ex. 8 to Compl., ECF No. 1-8 at PageID.61).  PILF did not supply a spreadsheet of the voters it identified as deceased but again requested an "immediate meeting" (*id.*).

On December 11, 2020, PILF sent another "follow-up" letter, requesting Secretary Benson "permit inspection or provide copies" of certain records (Ex. 9 to Compl., ECF No. 1-9 at PageID.63–64).   PILF indicated that unless copies of the records were provided, it planned to "send a representative to your office to inspect these documents on December 18, 2020" (*id.*).

On December 17, 2020, BOE staff advised PILF that it had not agreed to the inspection date and that the BOE's offices were closed to the public due to the pandemic and thus no inspection could take place (Ex. 10 to Motion, ECF No. 1-10 at PageID.65).  Further, BOE staff noted that they were "still awaiting [PILF's] matching criteria . . . so [the BOE] may properly analyze [PILF's] request and determine appropriate next steps" (*id.*).

On December 18, 2020, PILF sent a letter titled as "Notice of NVRA Violation" and indicating that "a lawsuit under the NVRA may be filed within 90 days" (Ex. 11 to Compl., ECF No. 1-11 at PageID.67–68).

Last, on January 13, 2021, PILF sent another letter to Secretary Benson reminding the Secretary of its earlier letters and request for inspection and resending the October 5, 2020 spreadsheet (Ex. 12 to Compl., ECF No. 1-13 at PageID.72–73).

On November 3, 2021, PILF filed this suit, alleging that Secretary Benson does not maintain accurate voter rolls because its "list maintenance activities have proven unreasonably inadequate to identify many registrants who are deceased, some of which have been deceased for a significant number of years and been published in newspaper death notices" (Compl. ¶¶ 4, 6,

25).  On December 13, 2021, Secretary Benson answered PILF's Complaint (ECF No. 14) and
moved to dismiss Count I, either for lack of subject matter jurisdiction or, alternatively, for failure
to state a claim (ECF No. 18).  PILF filed a response in opposition to the motion on January 18,
2022 (ECF No. 16), and Secretary Benson filed a reply to the response (ECF No. 24, as corrected
by ECF No. 26).

On January 25, 2022, the Proposed Intervenors filed their Motion to Intervene (ECF No.
18), which both Secretary Benson (ECF No. 27) and PILF oppose (ECF No. 28).  The Proposed
Intervenors filed a motion for leave to file a reply brief (ECF No. 31), to which no responses in
opposition were filed.

## II.  ANALYSIS

### A.  Motion to Dismiss

**1. Standing**

Secretary Johnson argues that Plaintiff lacks standing to pursue Count I ("Violation of the
NVRA: Failure to Conduct List Maintenance").[1]  In Count I, Plaintiff makes the following
allegations:

> 63.  Defendant has failed to make reasonable efforts to conduct voter list
> maintenance programs that ensure that the deceased do not remain registered to
> vote, in violation of Section 8 of NVRA, 52 U.S.C. § 20507.
>
> 64.  Defendant's failure has not been corrected within 20 days of the Foundation's
> notice of the violation on September 18, 2020. 52 U.S.C. § 20510(b)(2) ("If the
> violation is not corrected…within 20 days after receipt of the notice if the violation
> occurred within 120 days before the date of an election for Federal office, the
> aggrieved person may bring a civil action in an appropriate district court for
> declaratory or injunctive relief with respect to the violation.")

---

[1] With regard to Count II, PILF's records claim, the Supreme Court has held that a plaintiff suffers
an "injury in fact" when the plaintiff fails to obtain information that must be publicly disclosed
pursuant to a statute.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).

65.   Defendant's list maintenance programs and activities have demonstrably failed to remove many thousands of long-deceased registrants from the state's list of eligible registrants. Whatever efforts are being made by Defendant, they are unreasonable within the meaning of the NVRA because they are demonstrably not working. The NVRA does not simply require a percentage or portion of dead registrants to be removed, it requires a program that actually reasonably detects dead registrants and removes them. When more than 25,000 deceased registrants are identified on the QVF and not removed for an extended period of years, the list maintenance program is not only unreasonable, it is failing.

66. The Foundation has suffered an irreparable injury as a direct result of Defendant's violation of Section 8 of the NVRA, 52 U.S.C. § 20507. Defendant's failure to comply with the NVRA has aggrieved and continues to aggrieve the Foundation by impairing its essential and core mission of fostering compliance with federal election laws and promoting election integrity. Defendant's failure to comply with the NVRA has caused and continues to cause the Foundation pecuniary injury, perceptibly impairs the Foundation's mission, and frustrates the organization's purposes. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369 (1982).

(Compl., ECF No. 1 at PageID.17–18.)

Specifically with respect to its standing to bring suit, PILF alleges that the NVRA violations have harmed and continue to harm and frustrate its purpose of "protecting the integrity of the electoral process, ensuring that accurate and current voter registration rolls are maintained, and educating the public about the same" (Compl. ¶ 7).  PILF alleges that its expenditure of "significant time and money in Michigan seeking to rectify Defendant's failure to clean up the voter rolls by removing the surfeit of deceased registrants from such rolls has also forced the Foundation to divert its limited resources from other states with similar issues" (*id.*).  PILF also alleges that it is entitled to bring this private right of action pursuant to § 11(b)(2) of the NVRA, 52 U.S.C. § 20510(b)(2), because PILF provided statutory notice to Secretary Benson "that Michigan was in violation of the NVRA" and Secretary Benson "failed to timely correct Michigan's NVRA violations by conducting reasonable list maintenance to ensure that deceased registrants were timely removed from Michigan's voting rolls" (*id.* ¶ 61).

8

a. *Article III standing*

Secretary Benson argues that the factual allegations in PILF's Count I fall short of satisfying the constitutional standing requirement, which is a threshold requirement to this Court's exercise of jurisdiction (ECF No. 11 at PageID.114).   Secretary Benson argues that PILF's Complaint lacks any allegation of an injury-in-fact particular to PILF, much less one "fairly traceable" to any conduct by Secretary Benson, or which is likely to be redressed by the relief requested from this Court (*id.* at PageID.114–115).

In response, PILF argues that it outlined in its Complaint activities that are "directly traceable" to Secretary Benson's refusal to follow the law and the negative impact that the diversion of PILF's limited resources from other states with similar issues had on its core mission (ECF No. 16 at PageID.177–178).  For example, PILF emphasizes that as alleged in its Complaint, it spent many thousands of dollars reviewing and analyzing Michigan's voter roll, investigating Defendant's list maintenance practices, and purchasing copies of the QVF and analyzing them against verifiable death records (*id.*).  According to PILF, the relief it requests from this Court—a judicial decree ordering Secretary Benson to implement and follow a reasonable and effective list maintenance program that cross-references the names of registrants against the SSDI—would correct Secretary Benson's violations of the NVRA and spare PILF from having to repeatedly monitor, purchase, and analyze Michigan's voter rolls (*id.* at PageID.179).

Dismissal of Count I for lack of Article III standing is not warranted.

Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts extends only to "Cases" and "Controversies."  "'[S]tanding,' by itself, traditionally has referred to whether a plaintiff can satisfy Article III's case-or-controversy requirement[.]" *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979)).  Whether a party has Article III standing is properly an issue of a court's subject matter jurisdiction under Rule 12(b)(1). *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017); *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013); *Roberts,* 655 F.3d at 580–81.  Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016)*.*  The doctrine of standing requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

An organization may have standing to sue on its own to challenge action that causes it direct injury, and the inquiry is "the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).  Specifically, the United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560.  The plaintiff must have suffered "[1] an injury in fact, [2] fairly traceable to the defendant's conduct, [3] that is likely to be redressed by a favorable decision from the court." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir. 2014).  Perceptible impairment to "the organization's activities" or a "drain on the organization's resources" qualify as concrete and demonstrable injuries for standing purposes.  *Havens Realty Corp.*, 455 U.S. at 379; *Online Merchants Guild v. Cameron*, 995 F.3d 540, 547 (6th Cir. 2021); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013).

The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the elements.  *Spokeo*, 578 U.S. at 338.  Where, as here, a case is at the pleading stage, the plaintiff

must "clearly ... allege facts demonstrating" each element.  *Id.  See also Primus Grp., LLC v. Smith & Wesson Corp.*, 844 F. App'x 824, 826 (6th Cir. 2021) (explaining that by questioning the sufficiency of the plaintiff's pleadings about standing, the defendants launch a "facial attack" on subject-matter jurisdiction).  A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

A plaintiff's burden in response to a Rule 12(b)(1) challenge is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996).  *See Lujan*, 504 U.S. at 561 ("[O]n a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'") (citation omitted)).  For example, the Supreme Court in *Havens Realty* held that the plaintiff-organization had sufficiently alleged standing based upon the following claim in its complaint: "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices."  455 U.S. at 379 (alteration in original).

In the Complaint at bar, as quoted more fully above, PILF has similarly alleged that Secretary Benson's failure to comply with the NVRA impairs PILF's essential and core mission of fostering compliance with federal election laws and promoting election integrity.  PILF also alleges that it has suffered and continues to suffer pecuniary injury because PILF diverted resources that could have been expended in other states to address Michigan's alleged voter roll deficiencies.  The Sixth Circuit has expressly found within-mission organizational expenditures

11

are enough to establish direct organizational standing.  *Online Merchants Guild*, 995 F.3d at 548–49 (citing cases therein).  Taking the allegations in PILF's Complaint as true, the Court determines that PILF has alleged a particular harm, which is fairly traceable to Secretary Benson's conduct and redressable by this Court, and therefore met its burden at the pleading stage to demonstrate injury in fact.  In other words, the Court holds that PILF has Article III standing to bring its list-maintenance claim in Count I.

      b. *NVRA's Notice Requirement*

Secretary Benson argues that the Court must also dismiss Count I because PILF has not complied with NVRA's notice requirement.  Secretary Benson argues that PILF's letters do not satisfy the statutory notice requirement for asserting a private cause of action under the NVRA where PILF's letters overstate the obligations imposed by § 8 of the NVRA (ECF No. 11 at PageID.112–113).  Secretary Benson opines that the NVRA does not require a state enact "an exhaustive program to remove every voter who becomes ineligible (much less every voter whom a private party claims is ineligible)" (*id.* at PageID.98).  Secretary Benson argues that PILF's letters also provide no basis for a finding that Michigan's program does not comply with the Act (*id.* at PageID.113).  Secretary Benson emphasizes that PILF's notice is deficient because PILF failed to provide her office with any additional matching criteria for its list of potentially deceased voters so that the state can verify or test PILF's results (ECF No. 11 at PageID.113-114; ECF No. 26 at PageID.284).

In response, PILF argues that its September 18, 2020 letter provided Secretary Benson with sufficient information to diagnose the problems in Michigan's voter list maintenance, and PILF emphasizes that it also followed up on the problems it identified on multiple occasions, providing Secretary Benson with 411 days from the date of its first letter to correct the ongoing violation

before filing suit (ECF No. 16 at PageID.171–172). PILF argues that Secretary Benson's interpretation of what the NVRA requires for pre-suit notice is not supported by the text of the NVRA or any case law interpreting the NVRA (*id.* at PageID.172–174).

Dismissal of Count I based on deficient notice is also not warranted.

Secretary Benson's argument implicates the question whether PILF falls within "the class of plaintiffs whom Congress has authorized to sue" under the NVRA, i.e., whether PILF has a cause of action under the statute. *See generally Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–238 (2014); *see, e.g., In re Cap. Contracting Co.*, 924 F.3d 890, 895 (6th Cir. 2019) ("Instead of creating a *jurisdictional* question (about the power of the court to decide an issue), these requirements may create a *merits* question (about whether the Bankruptcy Code's text gives the specific party a right to raise the specific objection.") (emphasis in original).

In the NVRA, Congress authorized a private cause of action as follows:

**(b) Private right of action**

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

52 U.S.C. § 20510.

PILF was "aggrieved" by the alleged NVRA violation, for the reasons previously stated, and PILF provided "written notice of the violation" to Secretary Benson by its letters.[2] Secretary

---

[2] The Court may properly consider the letters in this Rule 12 context as the letters are attached to PILF's Complaint and are central to its claims. *See Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016).

Benson challenges the *quality* of the notice, relying on the Sixth Circuit's determination that the purpose of the NVRA's notice requirement is to provide the states with "an opportunity to attempt compliance before facing litigation." *Miller*, 129 F.3d at 838.  Importantly, the Sixth Circuit's opinion in *Miller*, however, did not address the quality of notice required by the Act; indeed, the individual plaintiffs in *Miller* had not provided any notice at all.  Although Michigan sought dismissal of the individual plaintiffs in *Miller* for failure to comply with the notice provision, the Sixth Circuit declined to dismiss their suit on that ground.  *Id.*  The Sixth Circuit reasoned that because "Michigan had already received actual notice" and "made clear its refusal to comply with the Act until 'federal funds [were] made available to fully fund' the program," notice from the individual plaintiffs would have been "futile" and "unnecessary with regard to the purpose of the notice requirement." *Id.*

The Fifth Circuit subsequently declined to follow *Miller*, determining that the "exception" the Sixth Circuit had carved out was "wholly devoid of textual support in the statute." *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014).  Additionally, the Fifth Circuit observed that "[i]t is also apparent to us that the [notice letter before it] was too vague to provide [the defendant] with 'an opportunity to attempt compliance' … 'before facing litigation.'" *Id.* (quoting *Miller*, 129 F.3d at 838).  Secretary Benson relies on the Fifth Circuit's observation in support of its argument that this Court should likewise find PILF's notice deficient (ECF No. 11 at PageID.112).

The Fifth Circuit's observation is not binding on this Court (and is likely dicta).  In any event, the facts in *Scott* are distinguishable from the facts at bar.  The notice letter in *Scott* did not mention the plaintiff by name, and the letter cited "surveys and statistics" that did not implicate the declination form that was at issue in *Scott.  Scott*, 771 F.3d at 836.  In contrast, in its initial letter, PILF informed Secretary Benson that one year prior, in September 2019, it purchased a copy

14

of the Michigan QVF from the Secretary's office and compared the "active" portion of the extract against the SSDI and printed obituaries and other public notices (ECF No. 1-4 at PageID.48).  PILF indicated that its analysis showed there were potentially "more than 34,000 deceased individuals with an active registration in the State of Michigan at that time" (*id.* at PageID.49).  Indeed, PILF indicated that some matches listed dates of death from as early as the 1940s (*id.*).  The spreadsheet attached to its October 5, 2020 follow-up letter identified the voter ID numbers of the registrants it identified (ECF No. 1-6 at PageID.52).  Unlike the notice in *Scott,* the notice that PILF provided in this case would not be accurately described as "vague."

In general, district courts have found a notice sufficient when it "(1) sets forth the reasons that a defendant purportedly failed to comply with the NVRA, and (2) clearly communicates that a person is asserting a violation of the NVRA and intends to commence litigation if the violation is not timely addressed."  *Pub. Int. Legal Found. v. Boockvar*, 370 F. Supp. 3d 449, 457 (M.D. Pa. 2019) (citing cases therein and ultimately dismissing PILF's complaint where PILF had directed all communications regarding the purported NVRA violation to a state elections official and had not mentioned the secretary of state in any of the communications appended to the complaint).[3]

_____

[3] Secretary Benson relies on a subsequent decision of the district court in *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 360 (M.D. Pa. 2020), where the court pointed out that PILF had not provided "middle initials, city of residence, voter affiliation, social security numbers, or driver's license numbers" in support of its claim that deceased individuals were on Pennsylvania's voter rolls (ECF No. 11 at PageID.113).  The district court opined that these "data points are integral to ensuring the proper voters are removed from the rolls, and their exclusion results in a slower, less efficient verification process."  495 F. Supp. 3d at 360.  However, the district court's point was made within the context of its analysis of PILF's motion for a preliminary injunction, i.e., a motion qualitatively different from the motion to dismiss before this Court.  The question before the Pennsylvania district court at that time was not the quality of the notice but whether to grant PILF's request to "excise the names of thousands of 'potentially deceased' voters from voter rolls across Pennsylvania."  *Id.* at 356.  *See id.* at 360 (ultimately concluding that it was "not convinced that Defendant would be able to verify Plaintiff's list without more, let alone do so before the election").

15

For example, where the plaintiffs sent a letter informing the defendant that their research and "comparison of publicly available information" demonstrated "an implausible number of registered voters compared to the number of eligible living citizens," the district court held that the letter constituted "sufficient notice" for purposes of the plaintiffs' claim that the defendant failed to make reasonable efforts to conduct voter list maintenance programs. *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1331, 1335 (S.D. Fla. 2017). Where the plaintiff's letter "clearly articulated its concerns and stated it sought 'any records' pertaining to its concerns," the district court held that the letter met the NVRA's notice requirement. *Project Vote, Inc. v. Kemp*, 208 F.Supp.3d 1320, 1348 (N.D. Ga. 2016). Similarly, where the plaintiff's letter set forth "the reasons for [the organization's] conclusion that [the defendants] failed to comply" with the NVRA's list maintenance requirement, the district court found the letter was "sufficient to satisfy the notice requirement of the NVRA." *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012).

Where the plaintiff "outlined its theory in support of [its list-maintenance] claim" and "warned the county defendants that it might sue," the district court held that the notice letter constituted "adequate pre-suit notice." *Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 409 (M.D. Pa. 2021). Last, where the plaintiff's letter indicated that the county had "significantly more voters on the registration rolls than it has eligible live voters" and urged the recipient to work toward full compliance with the NVRA, the district court held that "[t]he letter gives the Defendant enough information to diagnose the problem," and the court indicated that "[a]t that point it was the Defendant's responsibility to attempt to cure the violation." *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 795 (W.D. Tex. 2015).

Having reviewed the statutory notice requirement, its purpose as construed by the Sixth Circuit, and caselaw applying the notice requirement, the Court holds that PILF's notice in this

case constitutes adequate pre-suit notice.  PILF set forth the manner in which Secretary Benson

has purportedly failed to comply with the NVRA's list maintenance requirements, and PILF

clearly communicated that it would commence litigation if the purported violation was not timely

addressed.  The quality of the notice provided in this case is sufficient to support the conclusion

that PILF falls within the class of plaintiffs whom Congress has authorized to sue under the NVRA.

## 2.  Failure to State a Claim

Alternatively, Secretary Benson seeks dismissal of PILF's Count I under Federal Rule of

Civil Procedure 12(b)(6) for failure to state a claim.  Secretary Benson argues that the factual

allegations in the Complaint, even if true, are insufficient to allege a violation of the NVRA's list

maintenance requirements (ECF No. 11 at PageID.117–119).  Secretary Benson argues that the

Act only requires the State of Michigan to implement a general program that makes "reasonable

efforts" to remove deceased voters from Michigan's voter rolls and that Michigan has implemented

such a program (*id.*).

In response, PILF asserts that Secretary Benson's argument is circular and amounts to

nothing more than "[w]e have a statutory procedure in place; therefore, ipso facto, it must be

reasonable" (ECF No. 16 at PageID.179–180).  PILF argues that its well-pleaded Complaint states

a plausible claim under the NVRA, and that the reasonableness determinations Secretary Benson

seeks are factual questions for another day, not part of a Rule 12 inquiry (*id.* at PageID.180–181).

Secretary Benson, in turn, argues in her reply that PILF's claim amounts to nothing more

than "Michigan's program must be unreasonable or else PILF would not have concluded that there

were so many dead voters" (ECF No. 26 at PageID.289).

Dismissal of Count I for failure to state a claim is not warranted.

As a threshold matter, while Secretary Benson relies on Rule 12(b)(6) for this part of her motion, subsection (c) is the relevant part of the rule, given that Secretary Benson has already answered PILF's Complaint. Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed." FED. R. CIV. P. 12(c). In any event, a motion for judgment on the pleadings pursuant to Rule 12(c) is resolved in the same manner as a motion to dismiss under Rule 12(b)(6). *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016). A court evaluating a Rule 12(c) motion must follow the Supreme Court's changes to the pleading standards in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020). Specifically, "[c]ourts must accept as true all well-pleaded factual allegations," and "the well-pleaded factual allegations must 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

As quoted more fully above, PILF has alleged that over 25,000 deceased registrants remain on Michigan's QVF and that thousands of these registrants have remained on the active rolls for decades. Further, PILF alleged that it gave this information to Secretary Benson, who, for over one year, "did nothing about it," despite the mandates of the NVRA and Michigan's Election Law. The factual allegations, accepted as true, plausibly give rise to an entitlement to relief under the NVRA. While Secretary Benson's position is perhaps equally plausible, that argument, at the pleading stage, is insufficient to warrant dismissal under Rule 12. *See, e.g., Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1107 (D. Colo. 2021) ("Colorado's registration numbers may not be unreasonably high in context or there may be a reasonable explanation for them, as the Secretary argues. But at the motion to dismiss stage, the Court does not 'weigh potential evidence that the parties might present at trial'") (citation omitted); *Voter Integrity Project NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D. N.C. 2017) ("Considering VIP–NC's allegation

18

that the number of registered voters in Wake County has exceeded, and continues to exceed, the number of eligible voters, which allegation is in turn supported by reliable data and WBOE's failure to use available jury excuse information, a reasonable inference can be drawn that WCBOE is not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA."); *Bellitto*, 221 F. Supp. 3d at 1365–66 (S.D. Fla. 2016) (finding the plaintiff pleaded sufficient facts to support its claim that the defendant "inadequately removed the names of registrants who have died or changed their address" and observing that whether the defendant's evidence can defeat the plaintiff's claims is a "fact-based argument more properly addressed at a later stage of the proceedings"); *Martinez–Rivera*, 166 F. Supp. 3d at 793–94 (holding that allegations of voter rolls containing more registered voters than citizens eligible to vote—a 105% registration rate—gave rise to a strong inference of a violation of the NVRA and stated a plausible claim for relief). PILF's allegations in this case "nudg[e]" its list-maintenance claim in Count I "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570). Therefore, dismissal of Count I under Rule 12(c) is properly denied.

### B.  Motion to Intervene

### 1. Intervention of Right

The Proposed Intervenors, who are self-described as organizations whose missions include, among other things, encouraging and supporting their respective "members' and constituents' participation in the electoral process," argue that they have the following two significant protectable interests in this litigation:  (1) "should [PILF] succeed, it would increase the risk that Proposed Intervenors' members or constituents may be improperly purged from Michigan's voter rolls due to error-prone or highly questionable database matching efforts"; and (2) "should the Court grant PILF's requested relief, Proposed Intervenors will be required to divert resources to

minimize the risk that their members and constituents will be disenfranchised while the relief is implemented, and to assist any wrongfully purged voters to re-register" (ECF No. 18 at PageID.197–198, 206–208; ECF No. 31-1 at PageID.352).  Proposed Intervenors opine that their particular interests are not shared by the present parties and that they therefore cannot rely on Secretary Benson or anyone else to provide adequate representation (*id.* at PageID.209–211).

In response, Secretary Benson points out her concerns with the timing of the motion and argues that the Proposed Intervenors' interests appear "entirely speculative and unfounded at this time" (ECF No. 27 at PageID.303–304, 307).  Secretary Benson argues that even assuming arguendo that the interests claimed by the Proposed Intervenors are cognizable and that there is reason to believe that any of the organizations' members or constituencies would be among the "potentially deceased," participation by the Proposed Intervenors is unnecessary because Secretary Benson has the same interest in ensuring that voters are not wrongfully removed from the voter roll and shares the same ultimate objective—dismissal of this suit (*id.* at PageID.304–307).

PILF likewise describes the interests claimed by the Proposed Intervenors as "speculative," emphasizing that the Proposed Intervenors assert no relationship with any of the 25,975 registrants that PILF has matched against a verifiable death record or offer "even the faintest suggestion that a single member or constituent faces the risk of 'needless' removal (ECF No. 28 at PageID.315–317, 319–324 (quoting Mot., ECF No. 18 at PageID.206)).  PILF also emphasizes that Secretary Benson is "legally bound to safeguard the voting rights of *all* eligible registrants" (*id.* at PageID.316 (emphasis in original), 324–325).  Last, regarding timing, PILF also points out that "the interactions between the parties started years ago" (*id.* at PageID.325).

Intervention of right is properly denied.

Rule 24(a)(2) of the Federal Rules of Civil Procedure provides that "[o]n timely motion, the court must permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  To succeed on such a motion, the movant must demonstrate that: "1) the [motion] was timely filed; 2) the [movant] possesses a substantial legal interest in the case; 3) the [movant's] ability to protect its interest will be impaired without intervention; and 4) the existing parties will not adequately represent the [movant's] interest." *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011).  "Each of these elements is mandatory, and therefore failure to satisfy any one of the elements will defeat intervention under the Rule." *Id.*

The Court determines that the Proposed Intervenors have not satisfied all four elements necessary for intervention of right.  Here, the motion to intervene, which was filed while the parties were already briefing their motion to dismiss, is arguably untimely.

Second, while the Sixth Circuit has adopted a rather expansive notion of the interest sufficient to invoke intervention of right, this does not mean that any articulated interest will do. *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula, Michigan*, 41 F.4th 767, 772 (6th Cir. 2022).  Establishing a substantial legal interest is "necessarily fact-specific." *Id.* (quoting *Miller*, 103 F.3d at 1245).  On the facts at bar, the Court is not convinced that the interests the Proposed Intervenors claim, which turn on some amount of increased risk of future disenfranchisement, constitute a substantial legal interest.  While Rule 24(a)(2) uses the words "may have" in describing the type of interest that qualifies for intervention, *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991), interests cannot be speculative. *See United States v. Michigan*, 424 F.3d 438, 444 (6th Cir. 2005) ("Rather than identifying any weakness in the state's

representation in the current phase of the proceedings, the proposed intervenors seem more concerned about what will transpire *in the future* should the district court determine that the Tribes' inland treaty rights continue to exist.... While the proposed intervenors may be legitimately concerned about these future issues, they are not now, and possibly never will be, before the district court.") (emphasis in original).  Third, for these same reasons, the Proposed Intervenors retain options for protecting their interests outside of intervention in this case.

Last, given the issues presented in the Complaint, the Court determines that Secretary Benson will adequately represent the Proposed Intervenors' interests.  When, as here, the proposed intervenor and party to the suit currently share the "same ultimate objective," a presumption of adequate representation arises.  *Wineries*, 41 F.4th at 774.  While the positions of the Proposed Intervenors and Secretary Benson may not identically align, their interests are sufficiently overlapping such that there is no substantial doubt that their concerns about disenfranchisement are already being adequately represented by Michigan's Secretary of State.

Given the Proposed Intervenors' failure to satisfy any one of these mandatory elements, the Court determines that their request for intervention under Rule 24(a)(2) must be denied.

## 2.  Permissive Intervention

Alternatively, Proposed Intervenors argue that this Court should grant them permissive intervention because their motion is timely, and intervention will not unduly delay or prejudice the adjudication of the original parties' rights; Proposed Intervenors' interests are "distinct and not adequately represented by the existing defendants [sic]"; and (3) Proposed Intervenors will "undoubtedly raise common questions of law and fact in opposing PILF's suit" (ECF No. 18 at PageID.212; ECF No. 31-1 at PageID.364–367).

Secretary Benson responds that while the Proposed Intervenors may allege defenses here that share a common question of law with the Secretary's, they do not possess any "special or distinct" interest in the subject matter of this litigation that warrants their intervention, nor will their presence in the lawsuit provide any particular benefit to the Court where their requested relief and legal arguments will be similar, if not the same, as that asserted by Secretary Benson (ECF No. 27 at PageID.308–309).

PILF likewise emphasizes that permitting intervention by the Proposed Intervenors will duplicate efforts, add to the parties' burdens, and cause undue delay and expense (ECF No. 28 at PageID.327–328).

Rule 24(b)(1) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[o]n timely motion, the court may permit anyone to intervene who … (B) has a claim or defense that shares with the main action a common question of law or fact."  "Resolution of a motion for permissive intervention is committed to the discretion of the court before which intervention is sought[.]" *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, ___ U.S. ___; 142 S. Ct. 1002, 1011 (2022).  Indeed, "[t]he district court retains broad discretion to exclude additional parties—even parties presenting common questions of law or fact—based on the totality of the circumstances." *Buck v. Gordon*, 959 F.3d 219, 226 (6th Cir. 2020).  *See also Kirsch v. Dean*, 733 F. App'x 268, 279 (6th Cir. 2018) (indicating that a district court "operates within a 'zone of discretion' when deciding whether to allow intervention under Rule 24(b)").

"In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  FED. R. CIV. P. 24(b)(3). Further, "[d]istrict courts can consider [the mandatory intervention] factors when evaluating permissive intervention motions."  *Bay Mills Indian Cmty. v. Snyder*, 720 F. App'x 754, 759 (6th

Cir. 2018). The basis for the court's decision must either be "obvious in light of the record" or provide enough of an explanation to enable meaningful review. *Miller*, 103 F.3d at 1248.

Here, as noted above, the Proposed Intervenors' motion is arguably untimely filed after the parties had already begun motion practice, although no scheduling order is yet in place and discovery has not yet begun. More importantly, the subject matter of this case is unique, and timely resolution is critical to the integrity of the election process, both its perceived and actual integrity. Adding three more defendants, even if they submit joint filings, realistically portends more discovery and more motions, and therefore more time and resources expended before a resolution of the important issues in this case can be rendered. As previously noted, the interests of the Proposed Intervenors are being adequately represented by Secretary Benson. Adequate representation "counsels against granting permissive intervention." *League of Women Voters of Michigan v. Johnson*, 902 F.3d 572, 579 (6th Cir. 2018) (quoting *Bay Mills Indian Cmty.*, 720 F. App'x at 759). Last, while the NVRA's notice requirement does not pertain to intervenors, *Miller*, 129 F.3d at 838, the nearly two-year span of communications between PILF and Secretary Benson also suggests that intervention by three third-parties at this juncture would not be appropriate. *See, e.g., Bay Mills Indian Cmty.*, 720 F. App'x at 759 (finding that "the long history of the dispute and the extensive litigation that has already occurred between Bay Mills and Michigan also suggest that intervention would not be appropriate").

In sum, for these reasons and those stated more fully by the parties, the Court determines that on balance, the totality of the circumstances do not favor permissive intervention. Permissive intervention will not serve judicial economy but will result in undue delay and prejudice to the existing parties. Therefore, in its discretion, the Court denies the Proposed Intervenors' request. The Proposed Intervenors are not precluded from seeking leave to file amicus briefs in future

dispositive motion briefing by the parties.  *See* W.D. Mich. LCivR 5.7(f) (requiring a proposed document to be attached as an exhibit to the motion seeking leave to file).

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motion to Dismiss Count I (ECF No. 10) is DENIED.

**IT IS FURTHER ORDERED** that the Motion for Leave to File a Reply (ECF No. 31) is GRANTED, and the reply brief (ECF No. 31-1) is accepted for docketing.

**IT IS FURTHER ORDERED** that the Motion to Intervene (ECF No. 18) is DENIED.

Dated:  August 25, 2022                                    /s/ Jane M. Beckering
                                                                   JANE M. BECKERING
                                                                   United States District Judge